Davis, Judge,
delivered the opinion of the court:
The House of Eepresentatives has asked us, under 28 U.S.C. §§ 1492 and 2509, to consider the plaintiff’s claim for $1,294,790 (plus interest) on account of items said to have been sold to, or taken by, the American forces in Eritrea in 1942 and 1943.[1] Plaintiff is an Italian corporation — engaged in freight forwarding, stevedoring, and transport — which was active in that pre-World War II Italian colony. The company had large installations there, as well as a considerable mass of supplies of various kinds. The British cap *476 tured Eritrea in tbe spring of 1941, and thereafter plaintiff, as an enemy firm, was no longer able to carry on its normal operations. During the war years, quantities of its supplies were taken or requisitioned as a result of the military occupation. The present claim is for. a portion of those goods.
Britain occupied Eritrea before this country entered World War II. As soon as their military occupation was firmly entrenched, the British established a military government known as the Occupied Enemy Territorial Administration; it was fully organized and functioning by the end of 1941 or early 1942. In September 1941, President Roosevelt ordered that lend-lease funds be used to establish and maintain facilities in the middle East to make effective the supply of American lend-lease materiel to Britain. Under that directive, the Army created the United States Military North African Mission, composed of elements of the Signal Corps, the Quartermaster Corps, the Ordnance Department, and the Corps of Engineers. This mission, which also worked with civilian contractors, had jurisdiction over American supporting activities in Eritrea. The first contingent of American military personnel arrived there in the middle of November 1941. Other personnel came later as Eritrea became a more important center of military preparation and possible evacuation. The United States group carried on various supply, maintenance, and training activities in aid of the British forces and of British combat operations in North Africa. The bulk of the supplies necessary for these American support functions came from the United States, but a substantial amount was gathered on the spot, either from British supplies or from local sources.
The plaintiff’s claim is for various items of movable private property which could be used directly for the war effort — such as piping, vehicles, drilling machines, railway equipment, cables, construction materials, etc. These items were removed, in 1942 and 1943, by American military or civilian personnel, and plaintiff’s representatives were given receipts signed by Americans (or in the name of an American organization) and in some instances by British officers. The contention is that the United States is liable to pay for *477 these goods since Americans took them for American operations. The defendant answers, among other things, that all procurement in Eritrea was under the authority of, and for, the British (the occupying power) and therefore that, if any allied state were liable, it would be the British Government.
There is a basic jurisdictional point, raised by the Government, which we should consider first. Section 1502 of Title 28 declares that, “except as otherwise provided by Act of Congress, the Court of Claims shall not have jurisdiction of any claim against the United States growing out of or dependent upon any treaty entered into with foreign nations.” In the Italian Peace Treaty of 1947, Italy, on behalf of its nationals, waived claims against the United States for loss or damage sustained as a result of acts of United States forces and agencies in World War II. Defendant asserts, and plaintiff denies, that this treaty stipulation vitiates the entire claim. It necessarily follows from Section 1502, defendant says, that the court must stop at once, without canvassing the Treaty arguments or passing upon the issue. We cannot accede to this position that we are barred from proceeding. It is not at all certain under our decisions that Section 1502 applies to congressional reference cases. Compare Thingvalla Line v. United States, 24 Ct. Cl. 255, 260-61 (1889)[2] with Wales Island Packing Co. v. United States, 73 Ct. Cl. 615, 624 (1931-2). Even if it does, we think that the provision does not prevent our deciding whether plaintiff’s claim is precluded by the Italian Treaty. The jurisdictional prohibition applies only to those cases where “the right itself, which the petition makes to be the foundation of the claim, must have its origin — derive its life and existence — from some treaty stipulation.” United States v. Weld, 127 U.S. 51, 57 (1888) (emphasis in original). See, also, Great Western Ins. Co. v. United States, 112 U.S. 193, 197-98 (1884); Eastern Extension Tel. Co. v. United States, 231 U.S. 326, 333 (1913); Falcon Dam Constructors v. United States, 136 Ct. Cl. 358, 364-65, 142 F. Supp. 902, 906-07 (1956); Societe Anonyme Des Ateliers Brille Freres v. United States, 160 Ct. Cl. 192, 196-199 (1963). Here, the; *478 situation is the reverse. In no direct sense does the plaintiff’s claim derive “its life and existence” from the Treaty; the claim is founded, rather, on the Constitution, the principles governing government contracts under the Tucker Act, and the Rules of Land Warfare. It is the Government which brings the Treaty to the fore as a defense; the claim itself, as distinguished from the defense, neither grows out of nor depends upon the Treaty. We think that 28 U.S.C. § 1502, as its words read and as it has been construed, permits the court to pass upon a treaty issue raised as a defense to a claim which is independent of the treaty. The prohibition is not framed, nor has it been applied, as forbidding this court to construe or apply a treaty.[3] Rather, the statute is a jurisdictional provision directed to the plaintiff’s own case and claim, not to the defendant’s position. In this respect, Section 1502 is comparable to 28 U.S.C. § 1331, giving the district courts “federal question” jurisdiction, which is interpreted as applying only where a well-pleaded complaint presents on its face a substantial claim founded directly upon federal law; the existence of a federal defense is not enough to confer jurisdiction on the district courts. Tennessee v. Union & Planters’ Bank, 152 U.S. 454 (1894); Louisville & Nashville R.R. Co. v. Mottley, 211 U.S. 149 (1908).
We have power, then, to consider the whole case and, as part of the case, to evaluate the Treaty defense. It is appropriate to come at once to that issue because, in a Congressional reference under 28 U.S.C. § 2509, we are to report first whether the plaintiff has a legal claim against the United States; if the Treaty defense is valid, there is at least one threshold reason why we must say, before considering the underlying merits, that plaintiff now has no legal claim.
*479 We hold the defense to be good. Article 76 of the Peace Treaty provides in pertinent part:
1. Italy waives all claims of any description against the Allied and Associated Powers on behalf of the Italian Government or Italian nationals arising directly ont of the war or ont of actions taken because of the existence of a state of war in Europe after September, 1, 1939, whether or not the Allied or Associated Power was at war with Italy at the time, including the following:
(a) Claims for losses or damages sustained as a consequence of acts of forces or authorities of Allied or Associated Powers;
(&) Claims arising from the presence, operations, or actions of forces or authorities of Allied or Associated Powers in Italian territory;
‡ ‡ ‡ $
(d) Claims arising out of the exercise or purported exercise of belligerent rights.
2. The provisions of this Article shall bar, completely and finally, all claims of the nature referred to herein which will be henceforward extinguished, whoever may be the parties in interest. * * *
There is a dispute, in which our Executive has taken no position, over the meaning of “in Italian territory” in Article 76(1) (b). Great Britain and France maintain, and Italy denies, that that phrase covers former Italian territory and not merely Italian territory at the time the treaty was made. But that controversy need not concern us. For paragraph (1) (a) of Article 76 contains no such limitation. In its terms it waives, without geographical restriction, all claims sustained as a consequence of acts of United States or British forces or authorities. Plaintiff’s loss was undoubtedly sustained as a consequence of such acts, i.e., as a result of takings or removals or purchases by British or American forces or organizations.[4] The words of subparagraph (a) *480 fully cover plaintiff’s claim and there is not the slightest reason to differ with the State Department’s interpretation that the Treaty waived claims of Italian nationals against this country for wartime demands such as these, “whether the subject of such claims took place in Italian territory or elsewhere.” See finding 16 (c) and (d), and footnotes 52 and 54.[5] The reference, in the opening part of Article 76(1), to the “existence of a state of war in Europe after September 1, 1939” is not a spatial limitation but a definition of World War II as it involved Italy. Nor. do we find any intimation supporting plaintiff’s interpretation in the Lombardo-Lovett Memorandum of Understanding of August 14,1947 (implementing Article 76 of the Peace Treaty) to which plaintiff calls our attention; that agreement reaffirms Italy’s waiver of all wartime claims, of any description, of Italy and of Italian nationals. See Treaties and Other International Acts series 1757.[6] We conclude, therefore, that plaintiff’s claim is completely barred by the Peace Treaty with Italy.[7]
Another reason why plaintiff has no legal claim is that its cause of action is barred by limitations under 28 U.S.C. § 2501. The petition in this court was filed on October 22, 1958; the resolution of the House of Eepresentatives which referred the matter to us (II. Bes. 604, 85th Cong., 2d Sess.) was adopted on July 15, 1958; the bill for plaintiff’s relief (H.B. 7686) was introduced on May 21, 1957. All these *481 dates are considerably more than six years after the last date on which plaintiff’s claim could have accrued. If the demand is posited on the Rules of Land Warfare, it arose no later than the proclaimed end of hostilities in World War II on December 31, 1946, or the conclusion of formal peace with Italy in 1947. See Cuban Truck & Equipment Co. v. United States, decided this day, ante, pp. 392-395. If a constitutional taking is alleged, the limitations period expired, under 28 U.S.C. §2501, no later than 1950 — -three years after the lifting of plaintiff’s disability as an enemy alien. The same rule would apply to a cause of action for breach of an implied contract of purchase. However the plaintiff’s legal claim be viewed, it was firmly barred by 1957 and 1958.
There is also a third reason why plaintiff has no legal claim. If the Italian Peace Treaty and the statute of limitations are put to one side, plaintiff would still fail because it has not proven any valid demand against the United States. Commissioner Evans’ detailed findings, which we adopt with slight modifications,[8] show that the procurement of plaintiff’s property in 1942-1943 was by the British authorities who were occupying Eritrea. Under the Hague Convention and the rules governing civilized warfare, an occupying power is entitled to seize any private property susceptible of direct military use, with compensation to be fixed at the conclusion of hostilities. See Cuban Truck & Equipment Co. v. United States, decided this day, ante, p. 392; II Oppenheim, International Law (Lauterpacht, 7th ed.), p. 404. The British followed that policy in Eritrea and formally announced their right to take moveable property susceptible of direct military use (finding 8(c)) :
These articles may be seized by the Occupier and no payment for them need be made at the time. Their seizure should, however, be recorded with sufficient particulars. Included in this category are all appliances *482 for tbe transmission of news, all types of transport by land, sea or air, and the spare parts and materials connected therewith, all firearms, and in general all kinds of war material. War material includes materials for the erection of military buildings, and steel and machinery capable of being used for the purposes of the Occupying Army. In respect of these no payment is to be made by the Occupier at the time, but an indemnity is due to the owner thereof after the conclusion of hostilities by arrangement between the two Governments: alternatively, they may be returned in kind when no longer required.
It is plain that the administration by the British of occupied Eritrea was carried on pursuant to this policy during the war years.
The items of property for which plaintiff makes claim fall into this class of articles susceptible of direct military use. The goods were “captured enemy property” (as the findings characterize them) because they could lawfully be seized under the laws of war without immediate payment, and they were so seized. The requisition of the property was legal under international law; the question of compensation, put off to the end of hostilities, was to be determined subsequently by international law and the arrangements to be made between the warring powers.[9]
The nub of the case is that Britain was the occupying authority in Eritrea and that it insisted that all seizure of goods susceptible of military use be through its procedures and under its aegis. Americans may have physically removed the property from plaintiff’s premises and Americans may have given receipts to plaintiff’s representatives. The goods were selected for, and to be used in, the American military operations which were supporting the British in and near Eritrea. But these surface facts did not convert the transaction into a taking by the United States rather than Britain, or into a commercial bargain between the United States and plaintiff. From the beginning, the British command made it clear to the United States party that Britain, as the occupying power, would do the local procuring of *483 articles of military use and that all such, procurement must go through British channels. The Americans were briefed on the British rules for this type of procurement, and the headquarters of the United States North African Mission in Cairo instructed that the British rules controlled. In particular, the British insisted that receipts be given for items susceptible of military use so that the owner could make claim for compensation to the British authorities at a later time.
It was natural for the British — the occupiers responsible under international law for the government and administration of the enemy country, as well as for arranging suitable indemnity after the hostilities ceased[10] — to require that military procurement be centralized under British auspices and that the British administration be the responsible agency. Britain would receive benefits from the American group’s use of the captured enemy property since the latter’s mission was to aid the former’s combat operations in that region. The financial burden, if there turned out to be any (see footnote 10, supra), would be borne by Britain as reverse lend-lease under the then current lend-lease arrangements between the two countries. It was equally natural for the American forces, who were there to give lend-lease support to the British war endeavor, to acquiesce in the occupier’s policy that military procurement should be British-controlled and therefore to act as agents for the British in seeking and removing goods for military ends.
On the whole record the Trial Commissioner has found, and we agree, that, although Americans may have chosen and removed the items involved in this proceeding, and receipted for them, the takings were by Britain and the documents signed (or given) by the Americans represented receipts for subsequent processing through British procurement channels. See finding 19. The case is very much like Kelly v. United States, 146 Ct. Cl. 416 (1969), cert. denied, 362 U.S. 975 (1960), in which the court dismissed a claim for the World War II requisition of an American’s castle in France on the ground that the “plaintiff’s property was taken by *484 French authorities under the laws of France.” In that instance, as here, the property was selected and used by United States forces for the purposes of the joint struggle, but the seizure itself was by the co-belligerent in actual and legal control of the territory. The United States is not liable to pay for such takings.
We turn, finally, to the “equitable” elements in plaintiff’s case. There are good reasons for lifting the bar of limitations (see 28 U.S.C. § 2509) because the defendant’s administrative consideration of plaintiff’s claim was slipshod and desultory. The Army lost the papers three times, failed to answer inquiries, and finally forwarded the matter to the General Accounting Office so late that that office denied any consideration on the basis of its 10-year statute of limitations (31 U.S.C. §71a). See finding 14 (b), (c), (d). But, as we have shown in the preceding portions of this opinion, it would do no good to remove the limitations bar. Plaintiff has had a full trial and the result is that it has been shown to have no legal claim against the United States — because of the Italian Treaty and because the United States did not take its goods.
In view of the Treaty waiver and the facts found, we see no equitable reason to soften the legal principles which would preclude recovery against the United States even if the time-bar were lifted. No special ground has been laid for excepting this particular plaintiff from the all-inclusive treaty agreement and we have been presented with no adequate reason why this country, other than as a gratuity, should bear the burden of plaintiff’s loss. In our judgment plaintiff has neither a legal nor an equitable claim against the United States.
This opinion and the findings of fact incorporated herein will be certified by the Clerk to the House of Representatives pursuant to House Resolution No. 604, 85th Congress, 2d Session.
EINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner W. Ney Evans, and the briefs and argument of counsel, makes findings of fact as follows:
*485 1. (a) Plaintiff[11] is a corporation under the laws of the Kepublic of Italy, with its principal office in Milan, Italy.
(b) This action is concerned with property of plaintiff’s “autonomous Eritrea section of Asmara,”[12] placed in Eritrea during the years immediately preceding the outbreak of war in Europe in 1939, and alleged to have been taken or purchased by the United States Army during the war.
(c) The action is before the court by reference from the House of Representatives by H. Kes. 604, 85th Congress, 2d Session,[13] transmitting H.R. 1686, 85th Congress, 1st Session.[14]
2. (a) Eritrea was an Italian colony at the time of Fascist Italy’s conquest of Ethiopia in 1936. After the conquest the two areas were combined to comprise Italian East Africa, with the capital in Asmara, Eritrea.[15]
(b) During the years 1935-1939 there was much activity by the Italians in Eritrea, in staging the conquest of Ethi *486 opia and in preparing to exploit the conquest. Eritrea, a barren land, was to be used as a gateway to the more ample natural resources of Ethiopia.
(c) As one of several Italian companies participating in these activities, plaintiff (engaged in the business of freight forwarding, stevedoring, and transport[16]) had extensive installations and facilities in and near Massawa, and smaller branches in Asmara, Decamere, Metemme, and Assab (all in Eritrea), and in Gondar, Ethiopia. As of the time of the British occupation of Eritrea in 1941 plaintiff’s facilities included:
(1) A principal marshaling yard in the Gherar area, which was the terminal of all maritime services and barge movements in the port of Massawa. These facilities, surrounded by a concrete wall, included numerous buildings— warehouses, workshops, garages, lodgings (with messhall and recreational facilities) for native labor — a pier some 360 feet long equipped with a narrow gauge rail line — a barge terminal — and vehicle parking areas on which were stationed numerous automobiles, station wagons, trucks (as many as 20), tractors (20), and trailers (150 to 200). The warehouses contained spare parts for trucks and smaller vehicles, tires and tubes, and some electrical equipment. The workshops were fitted with miscellaneous tools and equipment for the construction of buildings and the repair of boats and barges.
(2) Headquarters in the city of Massawa, partially owned and partially rented, consisting of offices, storage rooms, workshops, and residential buildings (for managerial and office staff). The office building was equipped with an electrical generator, ice manufacturing unit, and water plant (pumps and tanks).
(3) Rail connection at Otumlo Field, 4 miles from Mas-sawa, consisting of a large tract of land on which were several buildings — warehouses, workshops, garages, living quarters, and storage sheds. Two cranes served this facility, at which plaintiff maintained a supply of spare parts for *487 automotive equipment, shop machines, and a fuel depot with tanks and barrels.
(4) Smaller installations and facilities at Asmara, Dec-amere, Metemme, and Assab, equipped to service automobiles, trucks, and trailers, and to store (i) freight (in process of forwarding) and (ii) equipment (used in construction and roadbuilding and repair).
(d) The assembly and supply of these facilities were accomplished during the years 1935-1940. Movement of Italian commerce into Massawa was restricted following the outbreak of war in Europe in September 1939 and was halted altogether when Italy declared war on England in June 1940.
3. (a) On April 1, 1941, the British captured Eritrea. The occupation reached Massawa 1 week later. Units of British armed forces took over the waterfront area (Gherar) and the railhead (Otumlo Field). A month or so later the waterfront area was declared a military zone. Thereafter, until the end of hostilities, plaintiff’s personnel were excluded from the Gherar area. At the railhead, on the other hand, plaintiff’s watchmen were readmitted some time after the troops were withdrawn (following an occupation of a month or more). Plaintiff’s representatives found that large quantities of the materials and merchandise belonging to the company and to third parties were missing or heavily damaged. They learned later that substantial portions of the missing materials and merchandise were in the hands of the “indigenous” (native) population.[17]
(b) The evidence does not disclose details of the action (if any) by British forces in relation to plaintiff’s property at its various branches. Within a matter of months after the occupation, the British permitted Italian civilians who were (and had been) resident in Eritrea to move about freely and to seek and obtain employment at civilian jobs. One of plaintiff’s supervisory officers used this opportunity to learn what he could of plaintiff’s property and to assess *488 the situation with respect to it. His efforts were relatively unproductive while hostilities continued.[18]
(c) As soon as the military occupation of Eritrea was firmly entrenched, the British moved to establish a military government for the control and administration of the civil population and economy. It was known as the Occupied Enemy Territorial Administration (OETA). Among its officers was one known as Custodian of Enemy Property (CEP). By the end of 1941 or early 1942, OETA was fully organized and functioning.
4. (a) On September 13, 1941, President Roosevelt, “in order to comply with the expressed needs of the British government,” directed the Secretary of War to arrange “at the earliest practicable time for the establishment and operation of depots in the Middle East for the maintenance and supply of American aircraft and all types of ordnance furnished the British in that area * * *,” and “for the necessary port, railroad and truck facilities required to make the supply of American material effective.” The depots and transportation facilities were to “be established and operated under contract executed and administered by the appropriate branch of the War Department with American companies * * *.” Necessary funds were to “be furnished from Defense Aid appropriations” (lend-lease).
(b) The Army thereupon organized the United States North African Mission[19] “to render immediate aid to the British Government in its Middle East Military Area at the earliest practicable time by arranging for the establishment of an organization of supply, and maintenance facilities, with the necessary associated services to the end that all American equipment being sent to the British in the Middle East can be maintained in condition for combat, * * * to provide means of instructing British personnel in the operation and maintenance of American equipment, * * * [and] * * * to render the adjacent areas supply and maintenance assistance when required.”
*489 (c) Components of the Army participating in the United States North African Mission included (1) the Signal Corps, (2) the Quartermaster Corps, (8) the Ordnance Department, and (4) the Corps of Engineers.
5. (a) With respect to Eritrea (which was only a part of the British Middle East Military Area) the plans of the United States North African Mission contemplated:
(1) That the Signal Corps would establish a signal supply base depot at Massawa, in buildings to be leased or constructed by the Corps of Engineers.
(2) That the Quartermaster Corps would establish and operate (i) port, transportation, and storage facilities, (ii) maintenance facilities for motor transport equipment, and (iii) training centers to instruct the British in the use of American equipment.
(3) That the Ordnance Department would establish a depot at Asmara, to be supplied through the port of Massawa.
(b) In November 1941, the Corps of Engineers negotiated a contract with Johnson, Drake and Piper, Inc. (an American firm) to perform the architectural and engineering services and to do all of the construction work for the Corps of Engineers in Eritrea.
6. (a) On December 12, 1941, the first contingent of American military personnel (a major, a first lieutenant, and two enlisted men) arrived in Eritrea to lay the foundation for what later became the Eritrean Service Command.[20] The two officers were assigned a British lieutenant, as liaison officer, who took them to the British brigadier who was head of the Occupied Enemy Territory Administration.
(b) The British brigadier impressed upon the two American officers that the British were the occupying authority; that, pursuant to such authority, the British would do all of the (local) procuring; that anything the Americans wanted, obtainable locally, would be procured for them; but that procurement procedure must go through the British.
*490 (c) The two American officers mentioned in the preceding paragraphs of this finding remained on duty as above-described from the time of their arrival in December 1941 through March 1942. During that period they were joined by six or eight other officers. The new arrivals were briefed in the British rules for procurement. It is reasonably to be inferred from the evidence as a whole that all American officers who served in Eritrea during 1942 and 1943 were similarly briefed.[21] Emphasis was given to instructions from headquarters of the United States North African Mission in Cairo that there must be no friction with the British, and that British rules governed local procurement.
(d) The American officers who were early arrivals in Eritrea fully understood the United States North African Mission to be a lend-lease undertaking. Initially, there was some discussion between American and British officers of accounting, including credit to the British by way of reverse lend-lease for British procurement. Inasmuch as accounting was a higher responsibility, centering in Cairo, the officers in Eritrea, both American and British, directed their main attention to methods of procurement and the records requisite thereto, leaving the refinements of lend-lease accounting to others.
(e) Increasing personnel (American: military and civilian) brought increasing activity[22] and increasing needs. Procurement procedures were refined and expanded accordingly.
7. (a) The bulk of the supplies for the United States North African Mission in Eritrea came from the United States on requisition in usual military form.[23] For the procurement of other supplies, the several components of the United States Army (1) requisitioned (purchased) certain types of items obtainable locally from merchants and owners; *491 (2) obtained them from British supplies on band; or (3) got them from local owners through release by the British of captured enemy property.
(b) The British established a system whereby local currency was made available to the American military components for use in paying for supplies obtained locally (except captured enemy property) and for paying the wages of local labor employed by the American military and its civilian contractors.
(c) As items of machinery or equipment (of the type for which plaintiff claims) were located, and if they appeared to be in the category of captured enemy property, American Army officers made application to the British, who made the procurement.[24]
(d) The British were steadfast in their requirement that any American officer or civilian employee authorized to initiate procurement of a local item in the category of captured enemy property should give a receipt to the person from whom the item was obtained. The receipt was an indispensable support of the owner’s possible claim to the British for compensation. The standards whereby the British determined whether or not to make compensation are defined in finding 8(a).
8. (a) On December 31, 1942, the Eritrean Gazette, official British newspaper, published the following statement:[25]
INTERNATIONAL LAW IN OCCUPIED TERRITORY
There appears at times to be some doubt in the minds of the public in Eritrea, and especially the Italian public, as to the policy of the Occupying Authorities in the matter of requisitioning or seizing certain types of stores and materials.
The action of the Occupying Authority in this matter has been determined throughout by the provisions of International Law — to which Great Britain has subscribed many years ago, and to which almost all other Nations have also subscribed.
Under the rules of war, as is well-known to all students of International Law, all Beal Property belonging *492 to the Occupied State or Government which is of a military character (such as Forts, Arsenals, Dockyards, Barracks Railways, Bridges and Wharves) are at the absolute disposal of the Occupying Power. Real property of a non-military character may be used by the Occupying Authority in a reasonable manner, but not so as to diminish the value thereof: since the Occupier has not in this latter case any absolute right of disposal or sale. The properties of local, municipal or parochial authorities ought to be treated as though they belong to private individuals.
The moveable property of the former Government of the occupied territory can be considered as in two categories. All cash and funds which are the property of the State, and all other State property susceptible of direct military use (such as vehicles, telegraph and telephone instruments, arms and supplies) may be taken freely by the Occupying Power as booty of war; but other moveable public property of non-military character (such as boobs, pictures and works of art) must be respected and cannot be appropriated.
Of more interest to individual members of the public is the treatment of private property. In this again certain distinctions are drawn in accordance with the agreed decisions of the lawyers of all nations, as codified and embodied in International Law. In general, the private property of citizens of the Occupied Territory must be respected and theft, robbery and looting of such property is entirely forbidden. Buildings and lands owned by private individuals may be used for the necessities of the Occupying Army, and if they are so used no rent or compensation is payable by the Occupying Authority; but in certain cases where genuine hardship is caused to the owner by such use the Occupier may, if he thinks fit, make some ex gratia payment: he is not bound to do so.
The personal or moveable property of individuals is of three types. The first type consists of articles, stores of supplies of no military interest: these, if the Occupier or his soldiers or officials wish to acquire them, must be bought and paid for at a reasonable price. The second category consists of articles not susceptible of direct military use, but nevertheless generally necessary for the maintenance of the Army. Such are food and fuel supplies, liquor and tobacco, cloth for uniforms, leather for boots and similar articles. These, if required by the Occupying Army or Authority, may either be bought for *493 a fair and agreed price or may lawfully be requisitioned by the Occupier and a reasonable price paid.
The third category of moveable private property consists of articles susceptible of direct military use. These articles may be seized by the Occupier and no payment for them need be made at the time. Their seizure should, however, be recorded with sufficient particulars. Included in this category are all appliances for the transmission of news, all types of transport by land, sea or air, and the spare parts and materials connected therewith, all firearms, and in general all kinds of war material. War material includes materials for the erection of military buildings, and steel and machinery capable of being used for the purposes of the Occupying Army. In respect of these no payment is to be made by the Occupier at the time, but an indemnity is due to the owner thereof after the conclusion of hostilities by arrangement between the two Governments: alternatively, they may be returned in kind when no longer required.
In spite of the provision that no immediate payment is due for these materials susceptible of direct warlike interest, the British Authorities have, nevertheless, established the rule (in the interests of the Occupied population) that in cases where it is considered that definite economic harm will be done to the community by non-payment, then payment may in certain cases be authorised; and such payments have, in fact, been made upon many occasions in spite of the absence of any legal claim thereto by the owner. In this will be found the answer to the question which one sometimes hears asked by the owner of materials which have been seized — “Why should So-and-so have been paid, and not I?”. The answer is, as we have seen, that in respect of materials and stores of direct military value no immediate payment whatsoever need be made by the Occupying Power who seizes them, but that in certain cases, for reasons which appear adequate in that particular case, an ex gratia payment is nevertheless made. No such immediate payment would be made to a rich owner or powerful company, nor to a company whose shareholders are not present in this Territory; it might on the other hand be made to a poor man who had, by such seizure, lost his means of livelihood.
It will be seen that the provisions of International Law upon this matter (as upon so many others) are being carried out by the Occupying Authority not merely with correctness but with a generosity highly unusual in *494 the circumstances of a military occupation — and entirely unknown in the Occupied Territories of Europe to-day.
(b) An American Judge Advocate[26] who served in Eritrea on the staff of the United States North African Mission from August 1942 to April 1943 testified in this case (1) that the British authorities administered the occupation of Eritre'a in conformity with the statement quoted in the preceding paragraph; (2) that the United States North African Mission was a lend-lease operation; and (3) that United States Army officers in Eritrea on duty with the Mission had no authority to requisition private property in the sense of seizure or taking by force without the consent of the owner.
9. (a) In support of its claim plaintiff relies primarily upon a series of documents, bearing dates from May 1942 through August 1943, which are briefly described in chronological sequence in the succeeding paragraphs of this finding.
(b) May, 1942. One sheet (photostatic copy) bearing (1) a caption reading “Material Kemoved from Fratelli Gondrand by the U.S.M.N.A.M. for Shipment to Eritrea”; (2) the date “11.5.42”; (3) 'a listing, in 39 lines, of types and quantities of items (such as drilling machine, pipes, boards, radiators, etc.); (4) the legend (typewritten) “Assab, 15th May, 1942 (followed by the signature of W. Luesley) Captain, C.E.P.”; (5) a further legend (handwritten) “16/5/42 B. S. McKendrick, U.S.M.N.A.M.”; and (6) additional handwritten notations reading “* * * Barr Major RE * * * 15/4/42 Eef CBNB * * * 28/5/42.”
(c) May, 1942. Two sheets of thin paper[27] bearing (1) a caption reading “Piping Bemoved from Fratelli Gondrand by the U.S.M.N.A.M. for Shipment to Eritrea”; (2) columns of figures (under words and symbols) identifying the kind and quantity of material; (3) the legend (typewritten) “As-sab, 8/9th May, 1942 (followed by the signature of W. Luesley) Capt. C.E.P.”; (4) 'a further legend (in penciled script), “5/16/42 B. S. McKendrick, U.S.M.N.A.M.”; and (5) a carbon paper impression of handwriting, “* * * Barr *495 Major RE GHQ ME LGA GHQ ME * * * 15/4/42 Ref. CRME* * *28/5/42.”
(d) June, 1942. One sheet (photostatic copy) bearing (1) a caption reading “Brick Drums Removed from Fratelli Tondrand’s [sic] Yard, Essen, for Use on Massawa Railways, by Major Barr, R.E., Requisitioning Officer”; (2) the date “ll/12th June, 1942”; (3) the specification of 114 drums; (4) the legend (typewritten) “Captain, A/C.E.P.— Assab, 22.6.42”; and (5) the further legend (handwritten) “* * * Barr Major RE * * * 1/8/42 * * *.”
(e) August, 1942. Two sheets (photostated) bearing (1) the caption “List of Materials Removed by Major Barr R.E. from Fratelli Gondrand”; (2) the date “17/18 August 1942”; (3) a list of numerous items of plumbing (bathroom) fixtures, plus “5 Trailers”; 'and (4) the legend (handwritten) “* * * Barr Major RE GHQ ME 30/8/42 * * * ”
(f) October, 1942. Six typewritten sheets, in Italian, with English translation supplied in separate copy. The translation bears (1) the caption “List of Materials Removed by U.S.A. in the Field of S.N.T. Fratelli Gondrand at El Gherar, Massawa, during the Days and with the Vehicles as Shown Hereunder”; (2) various dates, by “morning” and “afternoon,” beginning with “7th October 1942” and ending with “15th October 1942”; (3) specification of items (7 pages of type, closely spaced); the legend: “The materials listed hereabove have been removed on behalf of U.S.A. of Asmara and Gura by Mrs. Ed. Boon 'and Alexander Hamilton. The receipt was signed on the 15th October 1942: ‘Received above: Signed Ed Boon.’ The original receipt was delivered through the interpreter of the U.S.A. Office O.S.D. of Asmara (Office of Capt. Nelson) for the drawing up of invoices, on the 20th October 1942.”
(g) November, 1942. Twelve sheets (printed forms headed “Local Purchase Record”) bearing (1) dates (i) in the heading “2/11/1942” and (ii) in the margin “4 Nov. 1942”; (2) identification of the “vendor” as “Soc. Gondrand * * * Massaua — El Gherar”; (3) specification, by 170 numbered entries, of “commodities” (random samples: incomplete column drill; radiators; male oak boards; International *496 tractor * * * 2 tyres; sacks * * * nails; wooden pulley * * * etc.); (4) rubber stamp “United States Army Ordnance Supply Depot”; and (5) second rubber stamp “4 Nov. 1942 United States Army Ordnance Supply Depot” followed by tbe signature of “D. C. Rizk.”
(h) January, 1943. A letterhead of Fratelli Gondrand bearing (1) the dateline “Asmara, 11-13 Gennaio 1943”; (2) the heading “Trailers Removed from Gondrand Field”; (3) description, in Italian, of 6 “rimorchio”s; and (4) the stamp “United States Army Ordnance Supply Depot Field Park.”
(i) January, 1943. Another sheet of Gondrand stationery datelined “Asmara, 14 Gennaio 1943” listing 4 additional “rimorchio”s and “1 disco con gomma” as “Trailer Removed from Gondrand Field — Amba Galliano — Asmara by U.S.A.,” bearing the stamp of “United States Army Ordnance Supply Depot Field Park” and the handwritten legend “Received Same 13-1-43 R. J. Young.”
(j) January, 1943. A third sheet of Gondrand stationery datelined “Asmara, 28 Gennaio 1943” listing 3 more “rimorchio”s as “Trailer Removed from Gondrand Field— Amba Galliano — Asmara—by U.S.A.,” bearing the stamp “United States Army Ordnance Supply Depot Field Park” over which appears in handwriting “Received Okay” and under which is the signature “R. J. Young.”
(k) February, 1943. A fourth sheet of Gondrand stationery datelined “Asmara, 5 Febbraio 1943” listing (in Italian) 69 articles as (in English) “Materials Removed from Gondrand Field — Amba Galliano — by U.S.A.,” and bearing two stamps: “United States Army Ordnance Supply Depot Field Park” and “Robert J. Young Sup’t. Field Park U.S.A., O.S.D.,” followed by initials in pencil, “R.J.Y.”
(l) July, 1943. A printed form bearing (1) the heading “North African Mission Johnson, Drake & Piper Inc.”; (2) the location line “Asmara”; (3) “Req. No.”; (4) “No. 5213”; (5) “Shipment To”; (6) a lined, columnar box with “Quantity” and “Materials”; and (7) closing notes of “Obtained From” and “Expediter (Name).” The form contains the following penciled notes: after Asmara, “July 22,1943”; *497 after Shipment To, “USA Ordnance Officer Asmara”; under Quantity and Materials, “1 No Set Pistons Complete * * * (6 pcs)”; after Obtained From, “SNT FLLI Gondrand”; and after Expediter (Name) an illegible signature.
(m) August, 1943. A mimeographed form of the “War Department Q.M.C. Form No. 400, Requisition”; dated “August 18, 1943”; directed to “S.N.T. Flli Gondrand”; for shipment to “Motor Pool — Asmara—For Chevrolet U.S.A. 17954 Sedan”; specifying “Pistons for Chevrolet 1937 * * *” on “Ref. Field Req. No. 5213” (which is the requisition described in the preceding paragraph). The form further shows that the articles were “Requisitioned by * * * Colin A. Nurse, 2nd Lt. Sig. C.” and that the requisition was approved “For the CO” by “J. A. Larkin, 1st Lt. AGO Adj.”
' (n) August, 1943. Two other documents, on forms identical to those described in paragraphs (1) and (m) above, are also dated August 18, 1943, and call for pistons for a 1937 Chevrolet. In this instance the requisition was made by H. Anderson, Act. Supt. Transportation, and approved by Richard C. Carson, 1st Lieut. Corps of Engineers, Area Supply Officer.
(o) Undated. There is an undated photostat of a document bearing hand printing (except for what appears to be the signature of G. B. Woodd) stating: “Received from Gondrand 13 Cases Assorted Electrical & Diesel Equipment. Cases Marked as Listed.” Following are 12 numerical symbols, and “One Uncrated Flywheel.” Under Mr. Woodd’s signature appears: “Elect. Eng. USMNAM.”
10. (a) Robert Rennie Milne Barr, of East Oxford, Kent, England, a transport official in civilian life before the war, was called to service at the outbreak of war in 1939 and placed in the Corps of Royal Engineers, Transportation. He was sent to the Middle East in March or April 1941, and a year later was dispatched to Eritrea on orders from the British Middle East Command to obtain from Assab, Eritrea,[28] any materials which would be useful in carrying on the war. He was briefed by the representative of OETA *498 in Cairo, and proceeded to Khartoum, thence to Asmara, and thence to Assab. The trip from Asmara to Assab was made in a plane owned by Johnson, Drake and Piper, in company with a representative of that firm, K. S. McKen-drick, a superintendent.
(b) In Asmara, en route to Assab, Major Barr reported to the Commanding Officer of the British Eritrean Command, who advised him to work with Johnson, Drake and Piper. Major Barr and Mr. McKendrick agreed upon a plan of cooperation whereby the two of them would decide who should have what in Assab, and McKendrick, on behalf of Johnson, Drake and Piper, would lend Major Barr some technical personnel, such as engineers in dismantling, to work under orders from Major Barr.
(c) In Assab, Major Barr reported to the local representative of OETA, British Major Slaney, who acknowledged Major Barr’s authority to take what he wanted, but suggested (1) that Major Barr should work with their Custodian of Enemy Property[29] (who proved to be Captain Duesley) and (2) that OETA and the CEP should have a record of what was taken. Major Barr agreed to these suggestions.
(d) Major Barr found it “quite impossible to take a complete record” of everything taken,[30] because of limited help, but, he said, “we did the best we could.” Whatever record was drawn up, he signed. As far as possible, he signed for Johnson, Drake and Piper, but sometimes their representatives signed and he did not. The Custodian of Enemy Property likewise, and for the same reason, found it impossible to sign for everything, and acknowledged the signatures of representatives of Johnson, Drake and Piper.
(e) Major Barr was in Assab for 8 or 4 months.[31]
*499 11. (a) The project manager for Johnson, Drake and Piper arrived in Asmara in late December 1941. He was joined by the personnel manager in February 1942. The company was active in Eritrea during 1942 and the first half of 194B. Work projects included a ship repair yard at Massawa, an airport at Ghura, hospitals at Miahabar and Ghinda, and a radio station at Asmara, together with the repair and maintenance of docks, machinery, roads, and equipment, and housing facilities for the labor forces at the several projects. At the height of operations in Eritrea, Johnson, Drake and Piper employees, in that country, included TOO Americans, 3,000 or 4,000 Italians, and 10,000 natives.
(b) Headquarters of the company, in Eritrea, were in Asmara,[32] as were likewise the headquarters for the British and American Eritrean Commands and of the various components of their armed forces, including the British OETA. The project manager of Johnson, Drake and Piper understood from the outset that local procurement of items of captured enemy property, especially of that category of property in the possession of Italians, would be channeled through the British. Employees of the company were instructed to take their requests for local procurement to officers of the United States Army’s Corps of Engineers who would, in turn, make the request of the British through OETA and its Custodian of Enemy Property, iby whom the property would be procured. They were also instructed to give receipts for all such property taken.
(c) In 1957, with the permission of the Army’s Corps of Engineers, Johnson, Drake and Piper destroyed the records of their wartime activity in the Middle East,[33] including lists of personnel.
(d) At the trial of this case the project manager and the personnel manager of Johnson, Drake and Piper identified *500 as two of the firm’s superintendents, E. S. McKendrick and Gil Wood.[34] They were unable to identify any others among the persons whose names appear on the documents described in finding 9.
12. (a) There is in evidence either no identification whatever, or identification[35] of a sketchy and inadequate nature, of: (1) H. Anderson; [36] (2) Ed Boon;[37] (3) Eichard C. Carson;[38] (4) Alexander Hamilton;[39] (5) J. A. Larkin;[40] (6) Captain Nelson; [41] (7) Colin A. Nurse,;[42] (8) D. C. Eizk;[43] and (9) E. J. Young.[44]
(b) All of the documents signed by these men were dated from October 1942 to August 1943. The extensive list of items for which Ed Boon and Alexander Hamilton signed was ostensibly taken from El Gherar, Massawa, which became a British military zone in May 1941. The receipt was cleared by Captain Nelson in Asmara, where the presence of headquarters promoted general understanding of procurement channels. The more extensive list of items for which *501 D. C. Kizk signed also came from El Gherar, Massawa. All of the other receipts (except those described in paragraphs (m), (n), and (o) of finding 9) emanated from Asmara.
13. (a) Stanley B. Hayden (Lieutenant — Captain—Major) was stationed in Eritrea from February 1942 until January 1944, serving in 1942 as Area Supply Officer for the Corps of Engineers in the Eritrean Area and in 1948 as Area Engineer. During the closing months of 1943 the assignment of the Corps of Engineers in Eritrea was being closed out, its work having been completed. In August 1943, Major Hayden published, in the local papers (and in four languages), a notice to all contractors and suppliers having claims against the Army to come in and present their claims. Claims so presented, if properly documented and found to be valid, were paid.
(b) Plaintiff presented no claim in response to this notice. The inference from the evidence as a whole as to the reason for such failure is that plaintiff’s operations were shut down and it was unable at that time to document its claim. While two responsible officers of plaintiff were in Eritrea at the time, they were not in plaintiff’s employ (since plaintiff’s operations had been suspended) [45] and, as Italian civilians, they had to maintain themselves as best they could by whatever employment they could find. Consequently, they lacked time or facilities (and the ability to travel) requisite to preparation of a claim.
14. (a) Efitrea remained under the control of the British until September 15, 1952, when it became an autonomous territory federated with Ethiopia under the Ethiopian crown, pursuant to resolutions of the General Assembly of the United Nations of December 2, 1950, and January 29, 1952. Officers of the United States Army remained in Asmara throughout this time.[46] There was a Claims Officer in Asmara through part of 1947, and Adjutants after that time, as late as 1953.
(b) Plaintiff first made claim against the United States for property purchased or taken in Eritrea by a letter dated *502 July 1,1945, addressed to the Claims Officer in Asmara. This was the first of a series of unsuccessful efforts to get satisfaction, or even information, from representatives of the United States. Throughout the second half of 1945, during all of 1946, and into 1947,[47] plaintiff endeavored to get consideration of its claims by American Army officers in Asmara. Now and then a Claims Officer would ask for more information or for further documentation. As often as not, no reply whatever was made.
(c) After a lapse of 5 years, plaintiff, in October 1952, resumed its efforts to obtain consideration of its claims through the American office at Asmara. The Army, having once lost the documentation presented by plaintiff, misplaced it a second time. Plaintiff reproduced the documents and forwarded them to the Asmara office in June 1953. That office forwarded the claim to the United States, where the Army lost it a third time. Plaintiff made inquiry, in December 1953, through the office in Washington. It received no answer. Finally, on April 5, 1954, a letter addressed to plaintiff’s attorney advised that the claim had been forwarded to the General Accounting Office for appropriate action.
(d) On June 30, 1954, the General Accounting Office denied the claim on the ground that it was barred by the 10-year statute of limitations.[48]
15. The bill H.R. 7686,[49] which is the subject of the present reference under H. Res. 604,[50] was referred by the Chairman of the Committee on the Judiciary to the Secretary of War for comment. The Secretary of War replied:
* * * The Department of the Army is opposed to the
* * * It has been the consistent policy of the United States to refuse payments of those claims which, were waived by foreign nations on behalf of their nationals following World War II. * * * It was never intended that these claims should not be paid or that the claimants should be without a remedy. It was therefore provided that the country whose national was claiming *503 should consider and pay claims of this type which were meritorious. Article 76 of the Treaty of Peace with Italy so provides. * * *
16. (a) The Treaty of Peace with Italy was multilateral. Great Britain, France, and other countries were parties to it as well as the United States. The treaty entered into force on September 15,1947. It contained the following provisions (in Article 76[51]) :
1. Italy waives all claims of any description against the Allied and Associated Powers on behalf of the Italian Government or Italian nationals arising directly out of the war or out of actions taken ¡because of the existence of a state of war in Europe after September 1, 1939, whether or not the Allied or Associated Power was at war with Italy at the time, including the following:
(a) Claims for losses or damages sustained as a consequence of acts of forces or authorities of Allied or Associated Powers;
(b) Claims arising from the presence, operations, or actions of forces or authorities of Allied or Associated Powers in Italian territory;
* * * *
(d) Claims arising out of the exercise or purported exercise of belligerent rights.
2. The provisions of this Article shall bar, completely and finally, all claims of the nature referred to herein, which will be henceforward extinguished, whoever may be the parties in interest. The Italian Government agrees to make equitable compensation in lire to persons who furnished supplies or services on requisition to the forces of Allied or Associated Powers in Italian territory and in satisfaction of non-combat damage claims against the forces of Allied or Associated Powers arising in Italian territory.
(b) Not long after the treaty became effective, a controversy developed over its meaning, between Italy on the one side, and Great Britain, France, and the United States on the other. This controversy has never been resolved. Italy maintains (1) that the words “including the following,” in paragraph 1, are not illustrative but restrictive and (2) that the words “in Italian territory,” in paragraphs *504 1 and 2, refer only to territory of the Italian Government at the time the treaty was made and hence do not include former Italian territory. Great Britain and France disagree with Italy on both points.
(c) The United States, for reasons not fully developed by the evidence, stated its position in separate notes. In one note it challenged the Italian position with respect to the alleged restrictive effect of the words “including the following.” [52] In the other note it said “the meaning of ‘in Italian territory’ in paragraph 2 * * * is not clear.”[53]
(d) The United States has never indicated variance from its initial position that the Treaty of Peace effected a valid waiver of claims of Italian nationals against the United States for wartime claims.[54]
17. (a) Plaintiff has presented to the Government of Italy claims for the property involved in this proceeding. The Government of Italy has refused payment.
(b) Plaintiff has presented to the Government of Great Britain claims for property similar to the property involved in this proceeding.[55] The Government of Great Britain has refused payment.
*505 18. (a) The property for which plaintiff claims in this proceeding was captured enemy property. Referring to the statement published by the British in the Eritrean Gazette, on International Law in Occupied Territory (quoted in finding 8(a)), the property involved in this proceeding was “moveable private property consist[ing] of articles susceptible of direct military use.” It belonged to a sizeable if not “powerful” company “* * * whose shareholders are not present in this Territory.” It was therefore in the category for which “* * * no payment is to be made by the Occupier at the time,” although “an indemnity is due to the owner thereof after the conclusion of hostilities by arrangement between the two countries * *
(b) From the British standpoint “arrangement between the two Governments” was contained in the Treaty of Peace with Italy, whereby Italy waived the claims of its nationals against the British and undertook to make the requisite indemnity itself.
19. (a) The property described in finding 9 (b), (c), (d), and (e) was clearly requisitioned by a British officer, under specific orders, and with the knowledge and approval of the authorized British Custodian of Enemy Property and with the approval of the local British officer responsible for OETA.
(b) The property described in finding 9 (f) and (g) came from El Gherar, Massawa, a British military zone. The evidence as a whole precludes as impossible any inference (1) that British authorities were unaware of the identity of this property as described in finding 18(a) or (2) that British authorities permitted Americans (military or civilian) to procure property from this compound through channels other than those established and maintained by the British for captured enemy property.
(c) The property described in finding 9 (h), (i), (j), and (k) came from Amba Galliano, in (or near) Asmara, where headquarters of the British OETA and of components of the United States Army and of the civilian contractor for the Corps of Engineers made it equally unlikely that established procurement channels should be disregarded.
*506 (d) The only inference supported by the evidence as a whole is that the documents (whether “invoices,” “purchase orders,” “receipts,” or other) signed by Americans (officers of the United States Army or officials or employees of the civilian contractor, Johnson, Drake and Piper) acknowledging delivery to them of property of Fratelli Gondrand represent “receipts” for subsequent processing through British procurement of captured enemy property.
(e) Since the procurement was by the British, any obligation for payment (as for purchase) or for indemnity (as for seizure) was an obligation of the Government of Great Britain and not of the Government of the United States.

 Since the case was referred, the petition filed, and the hearings held prior to the decision of the Supreme Court in Glidden Co. v. Zdanok, 370 U.S. 530 (1962), we think it proper to file this report without reference to the Supreme Court’s opinions in that case. Accordingly, the defendant’s belated suggestion of lack of jurisdiction to entertain Congressional references is rejected.

 See, also, Chickasaw Nation v. United States, 22 Ct. Cl. 222, 247-48 (1887); Hayes v. United States, 44 Ct. Cl. 493, 497-98 (1909). Cf. Zadeh v. United States, 124 Ct. Cl. 650, 111 F. Supp. 248 (1953).

 In enacting the predecessor of Section 1502, Congress seems to have been concerned to prevent united States citizens from suing directly in the Court of Claims to collect monies paid by foreign governments to the United States, under a treaty, in discharge of a class of individual claims. See Great Western Ins. Co. v. United States, supra, 112 U.S. at 199-200.

 This reading does not equate subparagraph (a) with the British and -French reading of subparagraph (b). The latter is not confined to losses sustained “as a consequence of acts” of the forces or authorities of the Allied or Associated Powers but covers, as well, other claims arising from the “presence, operations, or actions” of those forces or authorities.

 Courts normally give great deference to the views of the Executive on the interpretation of treaties. Kolovrat v. Oregon, 366 U.S. 187, 194 (1961); Factor v. Laubenheimer, 290 U.S. 276, 294-95 (1933).

 The pertinent part of the Agreement provided: “RENUNCIATION OP CLAIMS BY ITALY OR ITALIAN NATIONALS
“1. (a) In reaffirmation of and connection with Article 76 of the Treaty of Peace with Italy, dated at Paris February 10, 1947, the Government of Italy waives all claims of Italy of any description arising directly out of the war or out of actions taken because of the existence of a state of war in Europe after September 1, 1939, against united States nationals or the Government of the United States of America, any of its agencies, or contractors or sub-contractors of, or licensees from the Government of the United States of America or its agencies.
“(b) The Government of Italy further discharges and agrees to save harmless the Government of the United States of America from any responsibility and liability for the processing, settlement and satisfaction of any such claims of Italian nationals.”

 In its Treaties with Roumania (61 Stat. 1799, 1815), Bulgaria (61 Stat. 1915, 1967) and Japan (U.S.T. & O. IA [1952] Part 3, p. 3187), the United States has also accepted waivers of claims of the foreign country and its nationals as a result of World War II.

 Plaintiff complains that the Commissioner did not hear its -witnesses and based his report on the written transcript of their testimony. The court has explicitly rejected such a complaint. Racine Screw Co. v. United States, 156 Ct. Cl. 256, 258 (1962). In the present case, the pertinent findings do not involve a choice of defendant’s witnesses over plaintiff’s, but, rather, the inferences to be drawn from the record as a whole.

 Plaintiff is wrong in asserting that Italian local law governed the right to payment and compensation. The occupier was not governed by the local law in procuring material for military use.

 One method of providing indemnity was to have the enemy power undertake to compensate its own nationals.

 The full name of plaintiff is Societá Nazionale Transport! Fratelli Gond-rand.

 The quoted phrase was used by plaintiff in its power of attorney to Mr. J. John Lawler (of counsel in the present proceeding) to present its claim to the Congress of the united States.

 The text of H. Res. 604 follows: “Resolved, That the bill (H.R. 7686) entitled ‘A bill for the relief of S. N. T. Fratelli Gondrand’, together with all accompanying papers, is hereby referred to the united States Court of Claims pursuant to sections 1492 and 2509 of title 28, united States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of said sections and report to the House of Representatives, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the united States, and the amount, if any, legally or equitably due from the United States to the claimant.”

 The text of H.R. 7686 follows : “Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Treasury shall pay, out of any money in the Treasury not otherwise appropriated, to S. N. T. Fratelli Gondrand the sum of $1,294,790. The payment of such sum shall be in full settlement of all claims of the said S. N. T. Fratelli Gondrand arising out of the sale of equipment to the United States Army in north Africa in 1942: Provided, That no part of the amount appropriated in this Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with this claim, and the same shall be unlawful, any contract to the contrary notwithstanding. Any person violating the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000.”

 Asmara is in the mountains, at an elevation of 7,700 feet, some 35 air (70 land) miles from Massawa, the principal harbor.

 At the outbreak of World War XI plaintiff had 1,000 or more employees in Eritrea.

 Months later, in the search for usable items “obtainable locally,” American officers found that many such items had literaUy “gone underground” at the hands of the ciyE population.

 He did succeed in reconstructing inventories of some of the installations, notably those mentioned in finding 2(c) (1), (2), and (3).

 In operation in Eritrea, the Mission became kno-wn as the united States Military North African Mission (USMNAM).

 The major (an Engineer officer) became the first commanding officer, because of his rank. The lieutenant served as adjutant, responsible for the authentication of documents and for personnel and administration generally.

 The same is true of supervisory personnel of the Engineers’ contractor, Johnson, Drake and Piper.

 Field Marshal Rommel’s threat to Egypt through Libya forced the British to prepare for the evacuation of Egypt. The Axis powers were obviously committed to a pincers movement through North Africa, from west to east, and through the Caucasus and the eastern Mediterranean, from eaist to west. Eritrea became, potentially, a staging area for British evacuation.

 For example, approximately 85 percent of the materials used by the Corps of Engineers’ contractor, Johnson, Drake and Piper, was shipped into Eritrea from the United States,

 For items located by Johnson, Drake and Piper, the contractor made application to the Corps of Engineers who took the request to the British.

 The paper carried proclamations in Italian as well as English. Whether or not the quoted statement was a proclamation does not appear.

 The Honorable Abe McGregor Goff, now a Commissioner of the Interstate Commerce Commission.

 These sheets were originally prepared for Eratelll Eertinelli, Assab, a firm which is not further identified in the evidence.

 Assab was a port city, with a harbor secondary to Massawa, but several miles south, on the Red Sea, a fact which gave it strategic importance.

 Major Barr testified: “* * * OETA * * * is a military organization of the occupying country * * * to look after the interest of the country that is occupiedand although they were British Army personnel, they were, In fact, acting for the Italians. Therefore, this Custodian of Enemy Property would not allow me just to go and take what I wanted, without his knowledge and permission. * * * he knew exactly what I was doing. * * * he was looking after the Interests of the Italians.”

 Gondrand’s property was a very small portion of the total property taken by Major Banr.

 His name appears on the documents described in paragraph (b), (c), (d), and (e) of finding 9, covering the period of May through August 1942.

 Asmara, as heretofore noted, was in the mountains at elevation 7,700 feet. The altitude provided it with a tolerable climate, whereas Massawa’s climate was all but intolerable to people from temperate zones. Asmara also had the facilities of a modem city.

 In addition to Eritrea, the firm had work projects (all for the Army’s Corps of Engineers), in Egypt, Palestine, Jordan, Kejnya, Anglo-Egyptian Sudan, Ethiopia, Saudi Arabia, Tripoli, and the Congo. At the height of activity the company’s employees exceeded 30,000.

 Gil Wood was identified as a superintendent of electrical wort. G. B. Wood signed the document described in finding 9(o) as an electrical engineer. The probability is that they were one and the same person.

 Such identification as there is in evidence of persons whose names appear on the documents described in finding 9 was supplied, in large measure, by the defendant. Plaintiff made no extensive effort either to identify these persons or to show when, by whom, or for what purpose the documents were prepared. It rested its case in reliance upon the documents at face value, without further explanation.

 Anderson signed as a Superintendent of Meld Part. Finding 9 (n). One officer, who did not recall him specifically, testified that “he was obviously our transportation superintendent looting after the vehicles * *

 Boon gave no identification. Mnding 9(f). He is unidentified.

 Carson signed as 1st Lieutenant, Corps of Engineers. Finding 9(n). A Lieutenant Carson was at one time Supply Officer for. the Corps of Engineers in Asmara.

 Hamilton gave no identification. Finding 9(f). One officer testified that he remembered him vaguely.

 Larkin signed as “1st Lt. AGO Adj.” Finding 9 (m). There was a Lieutenant Larkin who was Adjutant for the Eritrean Service Command at one time.

 Nelson signed as “Captain.” Finding 9(f). There is no further identification.

 Nurse signed as “2nd Lt. Sig. C.” Mnding 9(m). There is no further identification.

 Risk gave no identification. Finding 9 (g). A witness for plaintiff identified him as an American Army Officer. The records of the Army do not list a D. C. Risk and do not confirm the presence of an officer by the name of Risk as having served in Eritrea*

 Xoung signed as a Superintendent of Field Park. Finding 9(i), (j), and (k). This would mean that he was a civilian, as was H. Anderson. There is, however, no further identification of him.

 Plaintiff never again resumed operations in Eritrea.

 The TJnited States has retained control, under an arrangement with Ethiopia, of a radio station in Asmara which became, after the way ended, a larger installation than it was during the war.

 The Treaty of Peace with Italy, hereinafter noted, became effective in 1947.

 Act of October 9, 1940, 54 Stat. 1061, 31 U.S.C. § 71a.

 Finding 1(c), footnote 4.

 Finding 1(c), footnote 3.

 61 Stat. 1246, 1401.

 Note Verbale No. 1793, from tbe Embassy of the united States to the Ministry of Foreign Affairs of Italy, dated June 4, 1956, contained the following: “* * * the Government of the United States * * * will be unable to entertain any claims of any description of the Italian Government or Italian nationals arising from the * * * actions of forces or authorities of Allied or Associated Powers whether the subject of such claims took place in Italian territory or elsewhere. The matter of the interpretation of ‘in Italian territory’ in paragraph 2 of Article 76 will be the subject of a separate Note.”

 Note Verbale No. 1794, from the Embassy of the United States to the Ministry of Foreign Affairs of Italy, dated June 4, 1956,, contained the following : “* * * The Government of the United States considers that the meaning of ‘in Italian territory’ in paragraph 2 of Article 76. and whether this applies only to Italy proper or also to Italian prewar possessions, is not clear. However, this is a matter of not too great practical importance for the United States. It is hoped that the problem may be worked, out by the Italian Government with the British and French Governments by negotiation, arbitration or by some other agreeable method. * * *”

 A Foreign Service Despatch, dated November 14, 1958, from the American Embassy in Rome to the Department of State, Washington, contained the following: “The Department and the Embassy have always taken the position that the United States has been relieved of any liability on claims such as that of S. N. T. Fratelli Gondrand described in H. Res. 604 * * * by Article 7,6 of the Treaty of Peace and also by the provisions of Article 1 * * * of the Memorandum of Understanding of August 14, 1947 between * * * Italy and the * » * United States regarding the settlement of certain war time claims and related matters. * * *”

 Plaintiff has not made claim against the British for the identical property involved in this proceeding.