**BROWN & WILLIAMSON, LIMITED**

v.

**The UNITED STATES.**

**No. 39–81T.**

United States Court of Claims.

Aug. 25, 1982.

Lee H. Spence, Washington, D. C., for plaintiff; James K. Caudill, Louisville, Ky., attorney of record. Robert L. Ash, Kaler, Worsley, Daniel & Hollman, Washington, D. C., of counsel.

Allan C. Lewis, Washington, D. C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington, D. C., for defendant. Theodore D. Peyser, Jr., and Robert S. Watkins, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, DAVIS, Judge, and SKELTON, Senior Judge.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

### FRIEDMAN, Chief Judge:

Following a retroactive reduction of taxes by an income tax treaty, the plaintiff received a refund of taxes it had paid for four years before the effective date of the treaty. The question in this case, which is before us on cross-motions for summary judgment, is whether the plaintiff is entitled to interest on the refunds from the original date of payment of the taxes (as the plaintiff contends) or only from the effective date of the treaty (as the government argues). We hold for the plaintiff.

### I.

The plaintiff is a British corporation. In the years 1975 to 1978, the plaintiff's American subsidiaries paid it dividends from which the payors withheld federal income taxes. Under the Convention on Income Taxes, April 16, 1945, United States-United Kingdom, art. VI, para. 1, 60 Stat. 1377, 1381, T.I.A.S. No. 1546, *as modified by* Supplementary Protocol, March 17, 1966, art. 4, 17 U.S.T. 1254, 1257, T.I.A.S. No. 6089, the withholding rate for taxes on these dividends was a flat 15 percent. This withholding satisfied the tax liability of the plaintiff on these dividends.

The Convention on Income Taxes, Dec. 31, 1975, United States-United Kingdom, art. 10(2)(*b*)(i), 31 U.S.T. ——, ——, T.I.A.S. No. 9682, 1980–1 C.B. 394, 399, reduced the tax rate on these dividends to five percent. The effective date of the treaty was April 25, 1980. Under article 28(2)(*b*)(ii), the reduced tax rate was made effective as of January 1, 1975. *Id.*, 31 U.S.T. at ——, 1980–1 C.B. at 404. The plaintiff accordingly sought and received refunds of almost $17.5 million for the years 1975 to 1978.

The plaintiff sought also interest from the original date of payment of the refunded taxes. The Internal Revenue Service, however, ruled that interest was due only from April 25, 1980, the date the treaty went into effect. Rev.Proc. 80–18, § 4.04, 1980–1 C.B. 623, 628. The Service paid the plaintiff interest from the latter date to a date not more than 30 days before the date the refund was paid. *See* I.R.C. § 6611(b)(2) (1976), 26 U.S.C. § 6611(b)(2) (1976). In the present suit, the plaintiff seeks interest of more than $2.6 million for the period between 1975 and April 25, 1980.

### II.

Section 6611 of the Code governs the award of interest on overpayments of taxes. Subsection (b)(2) provides that interest on refunded taxes shall be paid "from the date of the overpayment" to a date not more than 30 days before the date of the refund check. The issue in this case is what was "the date of the overpayment" of taxes that

were refunded to the plaintiff. The plaintiff contends that the effect of the treaty provision making the reduction in taxes effective as of January 1, 1975, was to make the date of overpayment the dates upon which the refunded taxes were paid for the years 1975 to 1978. The government argues in opposition that since the amount of taxes paid in those years was correct at the time of payment, there was no overpayment until the treaty on its effective date in 1980 reduced the taxes retroactively, and that the later date therefore was the date of overpayment.

A. The United States concedes that the Service's normal practice has been and is to pay interest on retroactive refunds of taxes. As an example, it refers to the situation involving refunds of taxes paid on subsistence allowances of state police officers. After the Supreme Court in *Commissioner v. Kowalski*, 434 U.S. 77, 98 S.Ct. 315, 54 L.Ed.2d 252 (1977), held that those allowances were part of the taxpayer's gross income and subject to tax, Congress in 1978 amended the Code to provide that those allowances should not be included in gross income for tax years beginning January 1, 1970. Act of Oct. 7, 1978, Pub.L.No.95–427, § 3(b), 92 Stat. 996, 996, *as amended by* Act of Dec. 28, 1980, Pub.L.No.96–605, § 107(a), 94 Stat. 3521, 3524 (codified at I.R.C. § 119 note). The Service then made retroactive refunds of the taxes the police officers had paid on those allowances for those years, Rev.Proc. 79–13, 1979–1 C.B. 493, which, according to the government, also included interest on the refunds from the date of payment of the taxes.

■ The government's practice accords with the language of the Code. When a statute provides for a retroactive refund of taxes, the effect is to convert the previously paid taxes into overpayments, i.e., the amount of tax paid, although originally correct, now exceeds the correct tax liability. The date of overpayment of the refunded tax, therefore, is the date on which it originally was paid.

The practice also accords with Treas.Reg. § 301.6611–1(b), which provides: "[T]he dates of overpayment of any tax are the date of payment of the first amount which (when added to previous payments) is in excess of the tax liability . . . and the dates of payment of all amounts subsequently paid with respect to such tax liability." There is nothing in this language which supports the government's argument that the regulation covers only normal refunds but not refunds resulting from retroactive tax changes.

When Congress intends to deny interest on refunds, it explicitly so provides. For example, section 6611(e) of the Code provides that in the case of refunds of certain overpayments made within 45 days of the date for or the date of filing the return, "no interest shall be allowed under subsection (a) on such overpayment." Other provisions of the Code have the effect of limiting the amount of interest on refunds of overpayment. *See, e.g.,* I.R.C. §§ 6611(f) and 6611(g); Treas.Reg. §§ 301.6611–1(e), (f); Rev.Proc. 60–17, 1960–2 C.B. 942.

Moreover, where a statute retroactively increases the tax, the general rule apparently is that a taxpayer is liable for interest on the underpayments, even though the payments were proper when made. "The Tax Reform Act of 1976 [Pub.L.No.94–455, 90 Stat. 1520], enacted on October 4, 1976, made several changes which increased tax liabilities from the beginning of 1976." S.Rep.No.66, 95th Cong., 1st Sess. 85, *reprinted in* 1977 U.S. CODE CONG. & AD.NEWS 185, 262. Congress then passed the Tax Reduction and Simplification Act of 1977, Pub.L.No.95–30, § 305, 91 Stat. 126, 152 (codified at I.R.C. § 6601 note), which relieved "taxpayers from additions to tax, interest, and penalties (but not liability for tax) attributable to [estimated tax payments which were too low because of] changes in the tax law." S.Rep.No.66, 95th Cong., 1st Sess. 86, *reprinted in* 1977 U.S. CODE CONG. & AD.NEWS 185, 263. The report added, "The committee believes it is appropriate to grant to taxpayers affected by the 1976 legislation relief from additions to tax, interest, and penalties, similar to that which has traditionally been granted in connection

with earlier legislation where provisions were enacted with retroactive application." *Id., reprinted in* 1977 U.S. CODE CONG. & AD.NEWS 185, 263. The congressional understanding was that interest is payable on retroactive tax increases unless Congress forgives it. *Cf. Morton-Norwich Products, Inc. v. United States,* 221 Ct.Cl. 83, 602 F.2d 270 (1979), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1314, 63 L.Ed.2d 760 (1980) (taxpayer owed interest on deficiency even though pertinent regulations were applied retroactively in part).

 The Supreme Court has stressed the importance of symmetry in the payment of interest. *United States v. Koppers Co.,* 348 U.S. 254, 267, 75 S.Ct. 268, 274, 99 L.Ed. 302 (1955); *Manning v. Seeley Tube & Box Co.,* 338 U.S. 561, 568, 70 S.Ct. 386, 390, 94 L.Ed. 346 (1950). It would be inconsistent with these principles and unfair to taxpayers to deny them interest on retroactive refunds of taxes while requiring them to pay interest on retroactive increases in taxes.

Finally, what little decisional law there is on the subject supports the plaintiff. In *Siegel v. United States,* 84 Ct.Cl. 551, 18 F.Supp. 771 (1937), the court held that interest was due on a refund made under a retroactive tax statute. The court said that paying interest on refunds was the general rule and that it would apply, even in retroactive situations, unless Congress specifically prohibited it. The court distinguished its earlier decision in *Sunny Brook Distillery Co. v. United States,* 72 Ct.Cl. 157, 48 F.2d 976, *cert. denied,* 284 U.S. 637, 52 S.Ct. 20, 76 L.Ed. 542 (1931), which had denied interest on a retroactive refund, on the ground that *Sunny Brook* arose under "a special act of Congress . . . which was not a part of a general revenue statute." 84 Ct.Cl. at 559–60, 18 F.Supp. at 775. In the present case, the claim for interest rests upon a general provision of the Code, section 6611.

B. The government argues that because it was entitled to and properly held the refunded taxes prior to the effective date of the retroactive reduction of the taxes on April 25, 1980, it should not have to pay interest for that period. It urges that in-terest is payment for the use of money that it has in effect borrowed from someone else and that if the possession of the money was valid, interest on it is not due when the money is refunded because of a subsequent event. It relies upon *Manning v. Seeley Tube & Box Co.,* 338 U.S. 561, 70 S.Ct. 386, 94 L.Ed. 346 (1950).

In *Seeley,* the Commissioner assessed deficiencies in 1941 taxes together with interest from the date the tax was due. For the year 1942–43, the taxpayers had a net operating loss which, when carried back to 1941, fully abated the 1941 tax liability. The taxpayer filed claims for refund of the 1941 tax it had paid and for abatement of the assessed deficiency and interest. The Commissioner abated the deficiency and returned part of the tax paid but retained an amount covering the interest that had been assessed on the deficiency.

The Supreme Court held that
the interest was properly withheld by the Collector. The subsequent cancellation of the duty to pay this assessed deficiency does not cancel in like manner the duty to pay the interest on that deficiency. From the date the original return was to be filed until the date the deficiency was actually assessed, the taxpayer had a positive obligation to the United States: a duty to pay its tax. See *Rodgers v. United States,* 332 U.S. 371, 374 [68 S.Ct. 5, 7, 92 L.Ed. 3] (1947); *United States v. Childs,* 266 U.S. 304, 309–310 [45 S.Ct. 110, 111, 69 L.Ed. 299] (1924); *Billings v. United States,* 232 U.S. 261, 285–287 [34 S.Ct. 421, 425–426, 58 L.Ed. 596] (1914). For that period the taxpayer, by its failure to pay the taxes owed, had the use of funds which rightfully should have been in the possession of the United States. The fact that the statute permits the taxpayer subsequently to avoid the payment of that debt in no way indicates that the taxpayer is to derive the benefits of the funds for the intervening period. In the absence of a clear legislative expression to the contrary, the question of who properly should possess the right of use of the money owed the Government

for the period it is owed must be answered in favor of the Government. 338 U.S. at 565–66, 70 S.Ct. at 388–89.

*Seeley* did not involve the issue here, which is whether the "date of the overpayment" of the refunded taxes was the date of original payment or the effective date of the treaty that retroactively created the overpayment. *Seeley* rested in considerable part upon the Court's analysis of the loss carryback provisions of the Code, which it interpreted as not modifying either the taxpayer's duty timely to pay all taxes it owed or "the right of the United States to the interim use of the tax payments." *Id.* at 569, 70 S.Ct. at 390. It was because of this analysis that the Court in *Seeley* held that "where a deficiency and interest have been validly assessed under any applicable statutory procedure, a subsequent carryback with an abatement of the deficiency does not abate the interest previously assessed on that deficiency." *Id.* at 570, 70 S.Ct. at 391.

The present case, in contrast to *Seeley*, involves neither a deficiency assessment nor the "abate[ment of] the interest previously assessed on that deficiency." It involves the wholly different question of a taxpayer's right to recover interest upon taxes that initially were properly paid but that were refunded as a result of a subsequent retroactive change in the tax law. We decline to read into section 6611(b)(2) the use of money dictum from *Seeley* upon which the government relies.

For the reasons already stated, such a limitation of the broad language of that section would unduly and improperly limit its scope. Our conclusion on this point is consistent with prior decisions in which we similarly have refused to adopt the expansive reading of the *Seeley* dictum which the government espouses. *E.g., Martin-Marietta Corp. v. United States*, 189 Ct.Cl. 291, 418 F.2d 502 (1969).

C. Finally, the government makes several arguments based upon the 1980 treaty which, it asserts, requires the denial of interest on the refunds for the years 1975–78.

1. Although the treaty does not explicitly provide for the payment or nonpayment of interest, the government argues that the provision that the treaty "shall enter into force immediately after the expiration of thirty days following the date on which the instruments of ratification are exchanged," indicates that interest is not payable before that date. The same sentence also provides that the treaty "shall thereupon have effect ... in the United States ... in respect of tax withheld at the source, for amounts paid or credited on or after 1 January 1975." The fact that the treaty did not "enter into force" until April 25, 1980, does not establish that interest is not payable on the retroactive refunds of taxes that the treaty provided.

There have been other tax treaties that expressly provided that refunds were to be made without interest. Convention on Estate, Inheritance and Gift Taxes, Nov. 24, 1978, United States-France, art. 13, para. 2, 31 U.S.T. ——, ——, T.I.A.S. No. 9812, 1980–2 C.B. 391, 395 ("Any refund based on the provisions of this Convention shall be made without payment of interest on the amount so refunded"); Convention on Estate Taxes, April 16, 1945, United States-United Kingdom, art. VI, para. 2, 60 Stat. 1391, 1394, T.I.A.S. No. 1547 ("Any such refund shall be made without payment of interest on the amount so refunded"), *revoked*, Convention on Estate and Gift Taxes, Oct. 19, 1978, United States-United Kingdom, art. 14, 30 U.S.T. 7223, 7235–36, T.I.A.S. No. 9580 (art. 9(5), 30 U.S.T. at 7233, the refund provision, is silent on interest). When the draftsmen of treaties intended to deny interest, they knew how to do so.

2. The government contends that the general principles governing the payment of interest on refunds of retroactive tax reductions are inapplicable when the reduction results from a treaty rather than from a statute. It offers no convincing reason for that conclusion, however. The Internal Revenue Code itself recognizes that its provisions are subject to "any treaty obligation of the United States." I.R.C. § 7852(d); *see also* I.R.C. § 894.

The government points to the sentence in Rev.Proc. 80–18, § 4.04, 1980–1 C.B. 623, 628, stating that "Pursuant to Article 28 and for purposes of section 6611, the date of overpayment shall be considered to be April 25, 1980." This statement merely announced the Service's position on this issue, and gave no persuasive arguments to support the conclusion. It cannot be fairly read, as the government seeks to do, as distinguishing between retroactive refunds of taxes made pursuant to statute or pursuant to treaty.

### III.

■ Almost two months after the oral argument in this case, the defendant filed a motion to dismiss for lack of jurisdiction. It relies on 28 U.S.C. § 1502 (1976), which states: "Except as otherwise provided by Act of Congress, the Court of Claims shall not have jurisdiction of any claim against the United States growing out of or dependent upon any treaty entered into with foreign nations." The government argues that the claim for interest is one "growing out of or dependent upon" the 1980 treaty.

Although the 1980 treaty created the right to a retroactive refund of taxes, it is section 6611 of the Code that creates the right to interest upon the refunded taxes. As we have shown, the critical issue in the case is what was the "date of the overpayment" of the refunded taxes. That issue arises out of and is determined by the statute, not by the treaty.

In *S. N. T. Fratelli Gondrand v. United States*, 166 Ct.Cl. 473 (1964) (cong.ref.), the court held that for section 1502 to apply, the claim must "derive 'its life and existence' from the Treaty," and that section 1502,

> as its words read and as it has been construed, permits the court to pass upon a treaty issue raised as a defense to a claim which is independent of the treaty. The prohibition is not framed, nor has it been applied, as forbidding this court to construe or apply a treaty. Rather, the statute is a jurisdictional provision directed to the plaintiff's own case and claim, not to the defendant's position.

166 Ct.Cl. at 478 (footnote omitted); *see also Hughes Aircraft Co. v. United States*, 209 Ct.Cl. 446, 467–73, 534 F.2d 889, 902–06 (1976).

In the present case, as in *Fratelli* and *Hughes*, the plaintiff's claim (for interest retroactive to the date of payment of the refunded taxes) derives its "life and existence" not from the treaty but from section 6611 of the Code. The interest claim is independent of the treaty, and the government invokes the treaty as a defense to that independent claim. Section 1502 does not bar us from entertaining the claim.

### CONCLUSION

The plaintiff's motion for summary judgment is granted, and the defendant's motions to dismiss and for summary judgment are denied. Judgment is entered for the plaintiff. Pursuant to Rule 75(a)(2), the defendant is ordered to compute the amount of interest to which the plaintiff is entitled.

SKELTON, Senior Judge, dissenting:

I respectfully dissent.

### I. *The Jurisdictional Question*

At the outset we have a very serious jurisdictional question by reason of the provisions of Title 28, § 1502, which provides as follows:

> § 1502. Treaty cases
>
> Except as otherwise provided by Act of Congress, the Court of Claims shall not have jurisdiction of any claim against the United States growing out of or dependent upon any treaty entered into with foreign nations.

The Supreme Court and our court have held that the statute deprives us of jurisdiction if the right itself, which the petition makes to be the foundation of the claim, has its origin and derives its life and existence from some treaty stipulation, and could not exist independently of, or separate and apart from, the subject treaty. *See S. N. T. Fratelli Gondrand v. United States*, 166 Ct.Cl. 473 (1964); *Hughes Air-*

*craft Co. v. United States,* 209 Ct.Cl. 446, 534 F.2d 889 (1976); *United States v. Weld,* 127 U.S. 51, 57, 8 S.Ct. 1000, 1003, 32 L.Ed. 62 (1888). *See also, Great Western Ins. Co. v. United States,* 112 U.S. 193, 197–98, 5 S.Ct. 99, 101–02, 28 L.Ed. 687 (1884); *Eastern Extension Tel. Co. v. United States,* 231 U.S. 326, 333, 34 S.Ct. 57, 59, 58 L.Ed. 250 (1913); *Falcon Dam Constructors, v. United States,* 136 Ct.Cl. 358, 364–65, 142 F.Supp. 902, 906–07 (1956); *Societe Anonyme Des Ateliers Brille Freres v. United States,* 160 Ct.Cl. 192, 196–199 (1963).

We held in *Hughes Aircraft Co. v. United States, supra:*

> This requirement means that the claim involved must not merely be related to or connected with the subject matter of the treaty, but that, absent certain express terms or provisions thereof, there could be no claim at all.

209 Ct.Cl. at 470, 534 F.2d 889.

When these principles are applied to the plaintiff's demand in the instant case, it appears that its claim grows out of and depends upon Article 10(b)(i) and Article 28 of the Treaty, and that if these express terms and provisions were absent, there could be no claim at all.

Article 10(b)(i) of the Treaty provides:

Article 10—Dividends

(b) In the case of dividends paid by a United States corporation:

(i) to a corporation which is a resident of the United Kingdom and controls, directly or indirectly, at least 10 per cent of the voting stock of the United States corporation paying such dividend, the tax charged by the United States shall not exceed 5 per cent of the gross amount of the dividend; * * *

Article 28 provides:

Article 28—Entry Into Force

\* \* \* \* \* \*

(2) This Convention shall enter into force immediately after the expiration of thirty days following the date on which the instruments of ratification are exchanged and shall thereupon have effect:

\* \* \* \* \* \*

(b) in the United States:

\* \* \* \* \* \*

(ii) in respect of tax withheld at the source for amount paid or credited on or after January 1, 1975; and

\* \* \* \* \* \*

The plaintiff's claim grows out of Article 10(b)(i) of the Treaty and depends on it, because it shows the amount to be taxed (5 per cent of the gross amount of the dividend) and, consequently, the tax to be refunded. Plaintiff's claim for interest is based on this stipulation in the Treaty.

In like manner, plaintiff's claim grows out of Article 28 of the Treaty and is dependent on it, because it shows the effective date of the Treaty and the period during which a retroactive refund of taxes must be made. Without this stipulation, there would be no way that the plaintiff could assert a claim for interest on refunded taxes.

It is obvious that we must construe these provisions of the Treaty, and the Treaty as a whole, in considering plaintiff's claim. This is true as to Article 10(b)(i) to determine the amount of taxes to be refunded each year, and is true as to Article 28 to determine the number of years taxes are to be refunded, and the amount thereof, which in turn is the basis of plaintiff's claim for interest. Article 28, and the Treaty as a whole, must be construed as to its effective date in order to decide what is the date of overpayment of the taxes, as distinguished from the dates of actual payment. This is one of the hotly contested issues in this case.

The Internal Revenue Service (IRS) has construed the Treaty to mean that the date of overpayment of the taxes is April 25, 1980, the date that the Treaty became effective, and consequently no interest is due plaintiff except for overpayment of taxes for periods after that date. Unlike this court, the IRS is not under the inhibitions of Section 1502 and is free to construe the Treaty. We have no jurisdiction under the facts of this case to construe the Treaty in a

manner different to its construction by the IRS.

The plaintiff relies on Title 26 U.S.C. § 6611 to recover in this case. However, that statute is of no help to it on this jurisdictional question. This is so because plaintiff's claim does not exist independent of or separate and apart from the Treaty. Consequently, the claim grows out of and is dependent upon the Treaty. Therefore, Section 1502 and the above cited authorities deprive us of jurisdiction.

I would grant defendant's motion to dismiss for lack of jurisdiction and dismiss the petition.

## II. *On The Merits*

If we can assume that we have jurisdiction of plaintiff's claim, as the majority apparently has done, the plaintiff is still not entitled to judgment for the $2,638,689 in interest which it demands in this case. This is so for the following reasons.

This case is controlled by the following decided cases which are dispositive of the issues in the instant case and of plaintiff's claim. *Sunny Brook Distillery Co. v. United States*, 72 Ct.Cl. 157, 48 F.2d 976, *cert. denied*, 284 U.S. 637, 52 S.Ct. 20, 76 L.Ed. 542 (1931); *Manning v. Seeley Tube & Box Co.*, 338 U.S. 561, 70 S.Ct. 386, 94 L.Ed. 346 (1950); and *Matson Navigation Co. v. United States*, 131 Ct.Cl. 199, 130 F.Supp. 357 (1955). They will be discussed in the order named.

The case of *Sunny Brook Distillery Co. v. United States* is for all practical purposes on "all fours" with the instant case. In that case, certain liquor distillers had produced large quantities of whiskey on which they timely paid the correct amount of taxes of $6.40 per gallon which was legally due and owing at the time of payment. Thereafter, the 18th Amendment to the Constitution was adopted which made it illegal for the distillers to sell the whiskey for beverage purposes. To help relieve their economic situation, Congress passed a special Act which authorized the Commissioner of the IRS to refund all taxes paid by the distillers in excess of $2.20 per gallon, but, as in our case, the Act did not provide for the payment of interest on the refunded taxes. The Commissioner refunded the taxes in accordance with the Act, but, as in our case, refused to pay interest thereon from the date of payment to the date of the allowance of the refund. The Sunny Brook Distillery Company sued for interest on the refunded taxes for such period, as the plaintiff has done in the instant case. In a well-reasoned opinion we held for the government and denied plaintiff's interest claim. At the time of the court's decision, the following general revenue statutes were in effect that authorized the payment of interest on certain types of refunded taxes:

The Revenue Act of 1924, §§ 1011, 1019, 43 Stat. 253, 342 (26 U.S.C.A. § 149, and § 153 note), provided:

Sec. 1011. Section 3220 of the Revised Statutes, as amended, is re-enacted without change, as follows:

The Commissioner of Internal Revenue, subject to regulations prescribed by the Secretary of the Treasury, is authorized to remit, refund, and pay back all taxes erroneously or illegally assessed or collected, all penalties collected without authority, and all taxes that appear to be unjustly assessed or excessive in amount, or in any manner wrongfully collected. * * *.

Sec. 1019. Upon the allowance of a credit or refund of any internal-revenue tax erroneously or illegally assessed or collected, or of any penalty collected without authority, or of any sum which was excessive or in any manner wrongfully collected, interest shall be allowed and paid on the amount of such credit or refund at the rate of 6 per centum per annum from the date such tax, and penalty, or sum was paid to the date of the allowance of the refund. * * *

The Act of Congress approved February 11, 1925, 43 Stat. 860, chap. 208 (26 U.S.C.A. § 150), provided:

That the Commissioner of Internal Revenue may, pursuant to the provisions of section 3220, Revised Statutes, as amended, allow the claim of any

distiller for the refund of taxes paid in excess of $2.20 per proof gallon on any distilled spirits produced and now owned by him and stored on the premises of the distillery where produced. * * *.

The Revenue Act of 1926, § 1116(a), 44 Stat. 9 (26 U.S.C.A. § 153 note), provided:

> Sec. 1116(a). Upon the allowance of a credit or refund of any internal-revenue tax erroneously or illegally assessed or collected, or of any penalty collected without authority, or of any sum which was excessive or in any manner wrongfully collected, interest shall be allowed and paid on the amount of such credit or refund at the rate of 6 per centum per annum from the date such tax, penalty, or sum was paid to the date of the allowance of the refund. * * *.

The Revenue Act of 1928 provided in section 614(a), 26 USCA § 2614(a):

> Sec. 614(a). Interest shall be allowed and paid upon any overpayment in respect of any internal-revenue tax, at the rate of 6 per centum per annum. * * *.

In denying the plaintiff's claim for interest, we said:

> It is argued on behalf of the defendant that neither section 1019 or of the act of 1924, section 1116 of the act of 1926, nor section 614 of the act of 1928, provided for the allowance of interest in such a case as the one now before the court, and we think it must be conceded that these statutory provisions standing alone would not entitle the plaintiff to the interest which it seeks to recover. *It is plain that the original payment of the taxes included no "overpayment," as required by the act of 1928, nor were the taxes so paid "erroneously or illegally assessed or collected, * * * or in any manner wrongfully collected,"* as required in section 1019 of the act of 1924 and section 1116 of the act of 1926.

> \* \* \* \* \* \*

Moreover, the language used in these two sections with reference to cases where interest can be allowed is substantially the same as the language of section 1011 of the act of 1924, amending section 3220 of the Revised Statutes, and prescribing conditions under which refunds could be allowed. Evidently Congress considered that the provisions of the section last referred to were not sufficient to authorize a refund in a case like the one at bar, and consequently the provision under which the refund herein was granted was enacted. In other words, Congress did not consider that the circumstances of the instant case were included in any of the specifications of section 1011 of the act of 1924, and not being included therein the case does not come under the provisions of section 1116 of the act of 1926 or section 1019 of the act of 1924.

48 F.2d at 977. (Emphasis supplied.)

In thus holding, the court said in effect that a refund of tax could not be made to the distillers under Section 1019 of the Act of 1924 or Section 1116 of the Act of 1926 because the taxes were not erroneously or illegally assessed or collected, nor were they unjustly assessed or excessive in amount, which were prerequisites for a refund under those sections. That is why Congress passed the special Act allowing the refund to the distillers even though such prerequisites were not present with reference to the payment of their taxes.

In that case, the plaintiff argued that the mere passage of the Act authorizing the refund caused Sections 1019 of the Act of 1924 and 1116 of the Act of 1926 and 614 of the Act of 1928 providing for interest to become applicable. That is the same argument being made by the plaintiff in the instant case and is the theory of the majority in allowing interest to the plaintiff under Section 6611, which statute is word for word the same as Section 614 of the Act of 1928. The court rejected this argument saying that the terms and conditions of those sections "excluded a case like the one at bar." In other words, the court held that

before interest could be allowed under said sections of the general revenue statutes, the conditions or prerequisites therein provided, such as an erroneous or illegally assessed and collected tax, or one that was excessive in amount, must be present, and that such conditions and prerequisites did not exist in that case. Therefore, the court held:

We are therefore of the opinion that the Act of 1925 [that authorized the refund] *in no way brought plaintiff's claim within the requirements made for the allowance of interest.*

48 F.2d at 978. (Emphasis supplied.)

In that case, Judge Littleton wrote a very thorough concurring opinion. It is so pertinent and applicable to the instant case that I quote liberally from it. He said, among other things:

The amount of tax which Congress by the Acts of 1925 [authorizing the distillers' tax refund] and 1928 [Sec. 614, which is identical to the present Section 6511 allowing interest on a tax overpayment] authorized the commissioner to refund *was a tax levied by Congress, legally collected, and was not excessive in amount.* From the time the tax became due under the statute, it belonged to the United States and at no time after it was paid was it wrongfully withheld. The government was at no time using funds that belonged to the plaintiff. The underlying purpose of the allowance of interest upon a refund of a tax is that the government has collected from the taxpayer amounts in excess of those authorized by the taxing acts and has had the use of money that did not belong to it. *The reason for the allowance of interest did not exist in respect of the tax in question and in the absence of specific authorization for the payment of interest upon the refund of amounts which had been legally collected and at all times belonged to the United States, we should not read into the two acts in question the general provisions of law with reference to the payment of interest upon a tax erroneously or illegally assessed or collected.* Prior to the Revenue Act of 1921, approved November 23, 1921 (42 Stat.

227), no interest was payable upon taxes overpaid and refunded. By that act interest on overpayments was allowed under certain conditions. The Revenue Act of 1924, 43 Stat. 253, in section 1019 (26 USCA § 153 note), contained a provision for the payment of interest from the date of overpayment to the date of allowance of refund. The Revenue Act of 1926, 44 Stat. 9, in section 1116 (26 USCA § 153 note), again restricted the allowance of interest upon refunds and credits by paying interest upon amounts wrongfully withheld by the government during the time when the taxpayer was not indebted to the government for a like amount and also shortened the period during which the taxpayer could receive interest upon a claim. See *Riverside & Dan River Cotton Mills v. United States,* 37 F.(2d) 965, 69 Ct.Cl. 70 and *George U. Hind v. United States,* 41 F.(2d) 892, 70 Ct.Cl. 288.

48 F.2d at 980. (Emphasis supplied.)

Judge Littleton continued by holding:

The United States is not liable for interest except by its consent. The allowance of interest against the government is a matter of grace, manifestly restrictive, is never to be presumed, and should not be allowed unless clearly and specifically authorized. *We may not, therefore, presume that Congress in authorizing the refund of a portion of the tax duly imposed and legally collected by a special act which makes no mention of interest, intended that other provisions of law for the payment of interest upon taxes erroneously and illegally collected and wrongfully withheld should apply.* Neither may we read into the special acts of 1925 and 1928 for the benefit of distillers the general interest provisions with respect to illegal collections merely because such special acts refer to section 3220, Revised Statutes, as the authority by which the commissioner may allow the refund.

48 F.2d at 981. (Emphasis supplied.)

He also said:

I am of the opinion that Congress simply intended to return to distillers the

difference between the tax of $6.40 per gallon levied and collected upon liquor withdrawn and held for sale for beverage purposes, and the lesser tax of $2.20 levied and collected upon liquor held in bond and not yet withdrawn for beverage purposes or for the manufacture of any article used or intended for use as a beverage, *without interest thereon.* The reason for the return of a portion of the tax levied, assessed, and paid was because the liquor upon which it was levied and collected could not, because of the eighteenth amendment to the Constitution, be sold for beverage purposes. It was purely a voluntary act, and we may not assume that Congress intended to return more money than it specifically authorized.

48 F.2d at 981. (Emphasis in original.)

Briefly stated, the court held in that case that where a tax is duly and properly imposed and is legally due and owing and is timely paid in the correct amount by a taxpayer, and is later refunded by a special Act of Congress [a Treaty is such a special Act] without any provision authorizing the payment of interest, the taxpayer is not entitled to recover interest on the refunded taxes from the date of their actual payment to the effective date of the Act authorizing their refund. That is exactly the situation in the instant case which bars plaintiff's claim for interest.

The *Sunny Brook* case was decided by our court sitting en banc and its decision has never been overruled. We are bound by *stare decisis* to follow it. We have no authority as a panel to overrule an en banc decision. The majority commits serious error in failing to follow this en banc decision, which is squarely in point in the instant case.

The case of *Manning v. Seeley Tube & Box Co., supra,* is very much in point in the instant case, and, like the *Sunny Brook* case, bars plaintiff's claim for interest. There, the Commissioner of IRS levied an assessment in 1943 against a taxpayer for deficiencies in his 1941 income tax, together with interest from the date the tax was

properly due to the assessment date, which the taxpayer timely paid. In 1944 the taxpayer filed a return for 1943 which showed a loss, which, when carried back completely abated the taxpayer's tax liability for 1941. The Commissioner refunded the 1941 taxes to the taxpayer, but refused to refund the interest. The taxpayer then sued for interest on his 1941 taxes which taxes had been abated in 1944 by the carry-back of his 1943 losses. The Supreme Court denied recovery to the taxpayer and held in favor of the government, saying:

The problem with which we are concerned in this case is whether the interest on a validly assessed deficiency is abated when the deficiency itself is abated by the carry-back of a net operating loss.

*We hold that the interest was properly withheld by the Collector. The subsequent cancellation of the duty to pay this assessed deficiency does not cancel in like manner the duty to pay the interest on that deficiency. From the date the original return was to be filed until the date the deficiency was actually assessed, the taxpayer had a positive obligation to the United States: a duty to pay its tax.* See *Rodgers v. United States,* 332 US 371, 374, 92 L ed 3, 7, 68 S Ct 5[7] (1947); *United States v. Childs,* 266 US 304, *[566], *309, 310, 69 L ed 299, 301, 45 S Ct 110[111] (1924); *Billings v. United States,* 232 US 261, 285–287, 58 L ed 596, 607, 608, 34 S Ct 421 [425–426] (1914).

\*　　\*　　\*　　\*　　\*　　\*

\* \* \* The fact that the statute permits the taxpayer subsequently to avoid the payment of that debt in no way indicates that the taxpayer is to derive the benefits of the funds for the intervening period. *In the absence of a clear legislative expression to the contrary, the question of who properly should possess the right of use of the money owed the Government for the period it is owed must be answered in favor of the Government.*

It is apparent from an inspection of the Code that Congress intended the United States to have the use of the money lawfully due when it became due.

388 U.S. at 565–566, 70 S.Ct. at 389, 94 L.Ed. at 349–350. (Emphasis supplied.)

The Supreme Court also held:

It is clear, therefore, that Congress in 1942 did not intend to change the *basic* statutory policy: *the United States is to have the possession and use of the lawful tax at the date it is properly due.*

\* \* \* \* \* \*

Again it is apparent that the Code contemplates timely payment of taxes *and subsumes the right of the United States to the interim use of the tax payments.*

\* \* \* \* \* \*

388 U.S. at 569, 70 S.Ct. at 391, 94 L.Ed. at 351. (Emphasis supplied.)

Finally, the Supreme Court said:

*We hold that where a deficiency and interest have been validly assessed under any applicable statutory procedure, a subsequent carry-back with an abatement of the deficiency does not abate the interest previously assessed on that deficiency.* 388 U.S. at 570, 70 S.Ct. at 391, 94 L.Ed. at 352. (Emphasis supplied.)

While the facts in that case and those in the instant case are different, the principles and issues are the same in both cases. The similarities between the two cases are strikingly impressive. In both cases the taxes were legally due when paid by the taxpayers. In both cases the taxpayers paid the exact amount of the taxes that were due and no excess or overpayment was made at the times the payments were made. In both cases the government had the right to receive the tax payments and to hold the funds. In both cases the taxes were abated retroactively (in *Manning* by the loss carry-back and in the instant case by the retroactive effective date of the Treaty). In both cases the government refunded the abated taxes to the taxpayers. And, finally, the taxpayers in both cases sued for interest on the abated taxes. As shown above, the Supreme Court held in clear and unequivocal language in *Manning* that the taxpayer was not entitled to recover interest on the abated taxes. The same judgment should be rendered in the instant case. The major-

ity errs in refusing to follow the Supreme Court's decision in *Manning*.

A case similar to *Manning* is *Matson Navigation Company v. United States, supra,* decided by our en banc court. In that case, the taxpayer paid its excess profits tax in 1945 for 1944. In 1946 an excess profits credit carry-back allowance for that year abated all of the excess profits tax for 1944. The taxpayer claimed interest on the taxes from the date of their payment in 1945. We denied recovery saying there was no overpayment of the taxes until they were abated in 1946 by the carry-back. Consequently, the taxpayer was not entitled to interest on the taxes from the date of their payment but only from the date of their abatement, which was the date of overpayment. That is the situation in the instant case.

The majority relies on the case of *Siegel v. United States,* 84 Ct.Cl. 551, 18 F.Supp. 771 (1937). Its reliance on that case is misplaced for many reasons. In the first place, the facts and statutes involved there are completely different to those in our case. In the next place, the court limited its decision to the facts of that case by holding: "In the circumstances of this case \* \* \*." (18 F.Supp. at 776).

In *Siegel,* the facts show that one Oscar Siegel, a resident of Paris, France, died on December 17, 1917, leaving an estate containing shares of stock in United States corporations. An estate tax due the United States was paid on his estate. His wife, Marie Siegel, inherited his estate, and she died on May 1, 1918. An estate tax was paid to the United States on her estate, which contained the same shares of stock that were taxed on the estate of her deceased husband. To eliminate such double-taxation, Congress enacted a statute in 1921 that amended the general revenue laws of the United States. This statute was Section 403(b)(2) and (3) of the Revenue Act of 1921, which provided as follows:

In the case of a nonresident, by deducting from the value of that part of his gross estate which at the time of his death is situated in the United States \* \*

an amount equal to the value of any property forming a part of the gross estate situated in the United States of any person who died within five years prior to the death of the decedent where such property can be identified as having been received by the decedent from such prior decedent by gift, bequest, devise, or inheritance, or which can be identified as having been acquired in exchange for property so received: Provided, That this deduction shall be allowed only when an estate tax under this or any prior Act of Congress was paid by or on behalf of the estate of such prior decedent, and only in the amount of the value placed by the Commissioner on such property in determining the value of the gross estate of such prior decedent, and only to the extent that the value of such property is included in that part of the decedent's gross estate which at the time of his death is situated in the United States and not deducted under paragraphs (1) or (3) of subdivision (b) of this section. This deduction shall be made in case of the estates of all decedents who have died since September 8, 1916. * * *

In the case of any estate in respect to which the tax has been paid, if necessary to allow the benefit of the deduction under paragraphs (2) and (3) of subdivision (a) or (b) the tax shall be redetermined and any excess of tax paid shall be refunded to the executor.

The court pointed out that these provisions were continued without change in the Revenue Act of 1924 (section 1100(c), 43 Stat. 352) and in the Revenue Acts of 1926, 1928, 1932, and 1936, and remain in force at the present time. The court explained the purpose of the statute by saying:

* * * Since their enactment these provisions have directed that a deduction of the value of property previously subjected to an estate tax within five years shall be made in case of the estates of all decedents who have died since September 8, 1916, and that, in the case of any estate in respect to which the tax has been paid, if necessary to allow the benefit of the deduction the tax shall be redetermined

and any excess tax paid shall be refunded to the executor.

18 F.Supp. at 773.

Since Oscar and Marie Siegel both died after September 8, 1916, the executors of Marie's estate filed a claim for the refund of the estate taxes paid on her estate plus interest thereon. The Commissioner of IRS denied the claim and a suit for its recovery followed.

Judge Littleton of our court wrote the opinion in the case. It will be remembered that he wrote the very able concurring opinion in the *Sunny Brook* case. In his opinion in *Siegel*, he distinguished the case from *Sunny Brook* on the question of interest. In this regard, he said:

We think that case [Sunny Brook] is distinguishable from the one at bar. The Sunny Brook Case arose under a special act of Congress February 11, 1925, *which was not a part of a general revenue statute.* * * * That statute was based on special circumstances not present here.

\* \* \* \* \* \*

*In the case at bar, the statutory provision with which we are concerned was enacted as a part of a continuing general revenue statute of long standing.*

\* \* \* \* \* \*

* * * Nothing was said indicating a purpose *that interest provided for under other provisions of the same statute should not be paid on such refunds* and we may not read into section 403 a condition which is not justified by the language used. *Maul v. United States,* supra. [274 U.S. 501, 47 S.Ct. 735, 71 L.Ed. 1171]. The retroactive language of the section made the excess tax paid in a prior year, because of the failure to receive the benefit of the deduction therein provided, *an overpayment and an erroneous exaction within the meaning of other provisions of the same and subsequent statutes in which these terms are found.* In the absence of words to express a different purpose the interest provisions of the statutes containing the provision

allowing a deduction for property previously taxed within five years should be held applicable to all overpayments and refunds arising thereunder.

18 F.Supp. at 775. (Emphasis supplied.)

It is clear from these quotations from the opinion that the court favored the allowance of interest because Section 403 that authorized the refund was a part of the general revenue statute that contained *other provisions* that provided for the payment of interest. One such other provision so providing was Section 1116(a), 44 Stat. 119. Both sections were a part of the same general revenue statute and had to be considered and construed together. In support of this reasoning, the court said further:

> * * * In *Maul v. United States*, 274 U.S. 501, 508, 47 S.Ct. 735, 738, 71 L.Ed. 1171, the court said "In this situation effect should be given to the familiar rule that *in construing altered revenue laws 'the whole system must be regarded in each alteration,* and no disturbance allowed of existing legislative rules of general application beyond the clear intention of Congress.'"

18 F.Supp. at 774. (Emphasis supplied.)

In this regard the court held further:

> * * * When Congress has desired that interest be not paid on *an overpayment or excess collection authorized or provided for in a general revenue statute containing also provisions for the payment of interest on refunds,* it has specifically so directed. See section 325 of the Revenue Act of 1926 (44 Stat. 87).

> Section 1116(a), 44 Stat. 119, which governs this case, provides that upon the allowance of a refund interest shall be allowed and paid on the amount thereof at the rate of 6 per cent per annum from the date of payment.

18 F.Supp. at 775–6. (Emphasis supplied.)

The court then allowed interest from the date of payment of the taxes which Section 403 made by its language an erroneous exaction and an overpayment of excess taxes at the time of payment. This is to be contrasted with the facts in the case before us. Here, the Treaty by its terms did not make the payment of the taxes "an erroneous exaction and overpayment of excess taxes at the time of payment." The facts show, on the other hand, that the taxes were proper, due and owing at the time they were paid.

As stated above, the court distinguished *Sunny Brook* from *Siegel*, but never overruled *Sunny Brook*. The instant case is like *Sunny Brook* and should also be distinguished from *Siegel*. In *Siegel*, the court allowed interest primarily because Sections 403 and 1116(a) were both a part of the same general revenue statute, which were considered and construed together the same as if they had both been enacted at the same time. On this basis, Section 403 provided for the refund of the taxes, and Section 1116(a) of the same statute authorized the payment of interest from the date of payment.

In the instant case the facts and the law are both different to those in *Siegel* for all of the reasons pointed out above, as well as for the following. The Treaty was a special Act of Congress, as was the case in *Sunny Brook*. It is not a part of the general revenue laws of the United States, and contains no provision for the payment of interest on the refunded taxes. Also, Section 6611 of the general revenue statute is not a part of the Treaty, and, like in *Sunny Brook*, does not apply in this case. The Treaty stands on its own feet and we cannot re-write it so as to include in it any part of the domestic revenue laws, such as Section 6611, nor can we engraft Section 6611 onto the Treaty. When our government agreed in the Treaty to refund the taxes, it did so as a matter of grace. The refunded taxes of $17,470,000 was actually a gift to the plaintiff. See *Hind v. United States*, 70 Ct.Cl. 288, 41 F.2d 892 (1930) where we held, speaking through Judge Littleton:

> * * * Except as given by Congress, plaintiff had no right to interest; * * *. The allowance of interest by the sovereign is a matter of grace, depending upon its consent, which it can withdraw or modify at any time.

41 F.2d at 895.

Judge Littleton said in *Sunny Brook* with respect to the refunded taxes in that case:

It was purely a voluntary act, and we may not assume that Congress intended to return more money than it specifically authorized.

48 F.2d at 981.

The same principle applies here. We cannot assume that Congress intended by the approval of the Treaty to return more money than the amount of the taxes it specifically authorized to be refunded. To do so would be to impose by implication an obligation on the government to pay interest to which it had not consented. This would be in violation of its constitutional right of sovereign immunity. Consequently, the *Siegel* decision is inapposite to our case.

The majority asserts that the plaintiff should prevail in the instant case because it has been the practice of the IRS in the past to pay interest on retroactive refunds of taxes. This position is unpersuasive for several reasons. In the first place the Commissioner of the IRS is not bound by his previous actions and can change his position on the same problem in a later case. *Automobile Club v. Commissioner*, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957), and *Exchange Parts Co. v. United States*, 150 Ct.Cl. 538, 279 F.2d 251 (1960). Furthermore, there has been no IRS practice under the Treaty involved here, as this is the first case of this kind to arise under the Treaty, and the IRS says no interest is due on the tax refund. Also, the Commissioner of the IRS cannot waive the sovereign immunity of the government from suit by his practice or actions. Such waiver can only be made by Congress. Reliance by the majority on the previous practice of the IRS to sustain plaintiff's claim has the effect of holding that such practice waives the government's sovereign immunity from suit by implication. The cases are uniform in holding that this cannot be done. In *United States v. King*, 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969), the Supreme Court said:

\* \* \* [J]urisdiction to grant relief depends wholly upon the extent to which the United States has waived its sovereign immunity to suit and that *such a waiver cannot be implied but must be unequivocally expressed. United States v. Sherwood*, 312 U.S. 584 [61 S.Ct. 767, 85 L.Ed. 1058]. [Emphasis supplied.] [*Id.* at 4, 89 S.Ct. at 1503.]

In the case of *North Dakota-Montana Wheat Growers' Ass'n v. United States*, 66 F.2d 573 (8th Cir. 1933), *cert. denied*, 291 U.S. 672, 54 S.Ct. 457, 78 L.Ed. 1061 (1934), the court said:

It is fundamental that the United States cannot be sued without its permission, and that permission must be specifically granted by Congress. *It will not be implied.* It is a deep-rooted principle in the fabric of all English speaking countries that a sovereign is immune from suits in its own courts. In *Nassau Smelting & Refining Works, Ltd. v. United States*, 266 U.S. 101, 106, 45 S.Ct. 25, 69 L.Ed. 190, the court said: "The objection to a suit against the United States is fundamental, whether it be in the form of an original action, or a setoff, or a counterclaim. Jurisdiction in either case does not exist, unless there is specific congressional authority for it. \* \* \*." [Emphasis supplied.] [*Id.* at 577.]

In *General Mut. Ins. Co. v. United States*, 119 F.Supp. 352 (N.D.N.Y.1953), the court said:

It is beyond argument that the United States may be sued only where its immunity has been specifically waived by statute, and that *such waiver may not be implied in the construction of an ambiguous statute.* [Emphasis supplied.] [*Id.* at 354.]

In *Leyerly v. United States*, 162 F.2d 79 (10th Cir. 1947), the court held:

*The government does not consent to be sued by implication*, and consent to be sued should not be extended beyond the plain terms of the authorizing statute. *Price v. United States and Osage Indians*, 174 U.S. 373, 19 S.Ct. 765, 43 L.Ed. 1011; *Eastern Transportation Co. v. United States*, 272 U.S. 675, 47 S.Ct. 289, 71 L.Ed. 472; \* \* \*. [Emphasis supplied.] [*Id.* at 84.]

Thus, it appears to be clear that the previous practice of the IRS in tax refund cases is not material to any issue in this case.

The majority stresses the fact that there have been other tax treaties which provided that refunds were to be made without interest, pointing to a treaty with France and another with the United Kingdom, but the Treaty involved here has no such provision. It is not clear why the other treaties are mentioned, since each must stand on its own feet, unless by doing so the majority infers that since the Treaty before us does not mention interest on the tax refund while some other treaties prohibit it, there is thereby created *by implication* an obligation on the government to pay interest. If that is the purpose of the discussion about other treaties as compared to the one here, the majority runs squarely afoul of the many cases that hold that liability for interest cannot be imposed on the government by implication. We held in *United States v. Mescalero Apache Tribe*, 207 Ct.Cl. 369, 518 F.2d 1309 (1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976):

> It is fundamental that the Government has sovereign immunity from suit except where Congress has by legislation expressly waived such immunity. *This principle applies to claims for interest against the United States. See Ute Indians v. United States*, 45 Ct.Cl. 440, 470 (1910); *United States v. North Carolina*, 136 U.S. 211 [10 S.Ct. 920, 34 L.Ed. 336] (1890); *United States v. Sherman*, 98 U.S. 565 [25 L.Ed. 235] (1878); *United States ex rel. Angarica v. Bayard*, 127 U.S. 251, 260 [8 S.Ct. 1156, 1160, 32 L.Ed. 159] (1888); *United States v. N. Y. Rayon Importing Co.*, 329 U.S. 654, 658–59 [67 S.Ct. 601, 603, 91 L.Ed. 577] (1947); and *Smyth v. United States*, 302 U.S. 329 [58 S.Ct. 248, 82 L.Ed. 294] (1937).

207 Ct.Cl. at 378. (Emphasis supplied.)

In *United States v. N. Y. Rayon Importing Co.*, 329 U.S. 654, 67 S.Ct. 601, 91 L.Ed. 577 (1947), the Supreme Court held:

> * * * In other words, in the absence of constitutional requirements, interest can

be recovered against the United States only if express consent to such a recovery has been given by Congress. And

> * * * * * *

> * * * Thus *there can be no consent by implication or by use of ambiguous language.* Nor can an intent on the part of the framers of a statute or contract to permit the recovery of interest suffice where the intent is not translated into affirmative statutory or contractual terms. *The consent necessary to waive the traditional immunity must be express, and it must be strictly construed. Tillson v. United States*, 100 U.S. 43 [25 L.Ed. 543]; *United States v. Thayer-West Point Hotel Co.* [329 U.S. 585, 67 S.Ct. 398, 91 L.Ed. 521 (1947)].

> * * * * * *

> Had Congress desired to permit the recovery of interest in situations where the Court of Claims felt it just or equitable, it could have so provided. The absence of such a provision is conclusive evidence that the court lacks any power of that nature. Indeed, any other conclusion would permit the Court of Claims to supply the consent which only Congress can give to the imposition of interest against the United States.
> * * * Only Congress can take the necessary steps to waive the immunity of the United States from liability for interest on unpaid claims.

207 Ct.Cl. at 383–384. (Emphasis supplied.)

*See also, Sunny Brook Distillery Co. v. United States, supra* 48 F.2d at 981, and the above cited cases that hold that a waiver of sovereign immunity cannot be implied.

Therefore, the comparison of other treaties with the one before us does not impose by implication any obligation on the government to pay interest in this case, and is wholly irrelevant.

Title 26, § 6611, relied on by the plaintiff and the majority is of no help to the plaintiff in overcoming the constitutional prohibition against a waiver of sovereign immunity of the government from suit and from

the imposition of an obligation on the government by implication to pay interest. Section 6611 only authorizes the payment of interest where there has been an erroneous or illegal assessment or collection of taxes, or an actual physical overpayment of taxes, or where some other section of the general revenue laws, or some other statute, authorize it, which is not the case here. We expressed this principle as to overpayment very well in our decision by the full court in *National Steel Corporation v. United States*, 187 Ct.Cl. 458, 409 F.2d 571 (1969) as follows:

> It has long been settled law that interest is not allowed prior to the date of overpayment, but is allowed only after the actual date of overpayment. *Blair v. United States ex rel. Birkenstock*, 271 U.S. 348, 46 S.Ct. 506, 70 L.Ed. 983 (1926); *Matson Navigation Co. v. United States*, 130 F.Supp. 357, 358, 131 Ct.Cl. 199, 201 (1955). In the *Matson* case, the court reiterated the *Blair* case holding that:
>
> > * * * [W]here taxes are paid in installments, there is no overpayment of taxes until the date that the *total* amount of the installments paid first exceeds the total amount of tax due. Therefore, interest is allowed from the date of the payment of that installment which first exceeded the correct amount of tax due. * * *. [Emphasis supplied.] *Id.* 130 F.Supp. at 358, at 201.
>
> Thus, *the date on which the plaintiff actually overpaid its* excess profits *taxes* is an extremely critical question in computing interest due.
>
> 187 Ct.Cl. at 464–465, 409 F.2d at 574. (Emphasis supplied.)

Neither the plaintiff nor the majority can contend that during each of the years from 1975 to 1980 the plaintiff actually and physically tendered and paid more taxes to the government than it owed on the dates of such payments. The facts show that when such payments were actually made, the plaintiff paid the exact amount of taxes that were due. Consequently, Section 6611 does not authorize the payment of interest

on the taxes paid during the period of 1975–1980 prior to the date of their overpayment, which did not occur, as shown below, until the Treaty became effective on April 25, 1980.

I now come to a discussion of the date of overpayment of the refunded taxes. The plaintiff argues that the dates of the actual payments of the taxes during the period of 1975 to 1980 are the dates of overpayments, and that interest should be paid from those dates. The government contends that there was no overpayment until April 25, 1980, the effective date of the Treaty, because the taxes were not actually overpaid until that date. I think the law and the facts are with the government on this issue.

The Seventh Circuit Court of Appeals defined the word "overpayment" as applied to taxes in *Steiner v. Nelson*, 309 F.2d 19 (7 Cir. 1962), as follows:

> * * * The word "overpayment" in its usual sense means payment in excess of that which is properly due. "Whatever the reason, the payment of more than is rightfully due is what characterizes an overpayment." *Jones v. Liberty Glass Co.*, 332 U.S. 524, 531, 68 S.Ct. 229, 233, 92 L.Ed. 142.
>
> 309 F.2d at 21.

The case of *Matson Navigation Company v. United States, supra*, is directly in point. In that case, a 1946 carry-back of excess profit taxes wiped out such taxes of the taxpayer that had been paid in 1945 for the year 1944. The taxpayer claimed interest on the taxes for 1944 that it had paid in 1945. We denied recovery by a decision of the full court that held that there was no overpayment of the taxes until they were abated by the carry-back in 1946. We said:

> The $1,601,218.31 carry-back did not arise from the taxable year 1944, but rather from the taxable year 1946. This $1,601,218.31 was due in 1945, and was not and could not have been abated until the taxable year 1946, the taxable year giving rise to the carry-back. *It did not become an overpayment until 1946* and we see no reason why it should be treated as an overpayment before that date.

130 F.Supp. at 359. (Emphasis supplied.)

The decision in that case controls the disposition of the issue in the instant case as to the date of overpayment of the taxes. Like in that case, the tax payments here could not have been abated until the effective date of the Treaty on April 25, 1980, and, therefore, they did not become overpayments until that date. There is no difference between the abatement of the taxes in *Matson* by the carry-back and the abatement of the taxes here by the adoption of the Treaty. In both cases, the taxes became overpayments on the dates of the abatements and interest began to run only from those dates.

In view of the undisputed facts in this case and the above cited authorities, it is surprising to read the following statement in the majority opinion:

> When a statute provides for a retroactive refund of taxes, the effect is to convert the previously paid taxes into overpayments, i.e., the amount of tax paid, although originally correct, now exceeds the correct tax liability. The date of overpayment of the refunded tax, therefore, is the date on which it originally was paid.

If the majority means by this statement that in every case where correctly paid taxes are later refunded by a retroactive statute, such taxes automatically become overpayments on the date they were originally paid, it is obviously incorrect and contrary to the decided cases. This is demonstrated by the decisions in *Sunny Brook* and *Manning* and *Matson* where correctly paid taxes were later refunded, but such taxes were not thereby converted into overpayments at the time of their actual payment. The taxes in those cases were correct when paid and remained correct when refunded. The fact that they were refunded did not ipso facto make them incorrect when they were originally paid. The only case where such a statement would be applicable is one where the language of the refunding statute makes the taxes illegal at the time of actual payment. *Siegel* was such a case. There the language in Section 403 of the general

revenue law made the taxes an erroneous exaction and illegal at the time of payment. But that situation is not present in every case, and it certainly does not exist in the case before us. Here, there is no provision in the language of the Treaty that makes the taxes an erroneous exaction or an illegal collection or assessment at the time they were originally paid. The taxes were correct when they were paid and remained correct when by the grace of the government they were returned as a gift to the plaintiff.

### III. *Reciprocity*

Finally, there remains the question of reciprocity with respect to the provisions of the Treaty, which is not discussed in the majority opinion. This principle as applied to the instant case is adverse to the claim of the plaintiff. In this regard, our case is similar in many ways to *American Trust Co. v. Smyth*, 247 F.2d 149 (9 Cir. 1957). That case involved a treaty between the United States and the United Kingdom of Great Britain and Northern Ireland (the same countries that signed the Treaty that is before us) that exempted a resident of the United Kingdom not engaged in trade or business in the United States from United States taxes on gains from the sale or exchange of capital assets. The issue there was whether the exemption applied to a trust that was resident in the United Kingdom. The treaty did not mention trusts by name. The IRS contended that domestic laws of the United States should be applied which would deny the exemption to the trust. The court held on the grounds of reciprocity that the exemption did apply to the trust and that the domestic laws of the United States to the contrary did not apply. The facts showed that the United Kingdom does not impose an income tax on capital gains. The court reasoned that because of this fact a citizen resident in the United States who realized a capital gain on the sale of a capital asset in the United Kingdom would not have to pay a capital gains tax, and that on the policy of reciprocity a citizen (the trust) of the United Kingdom similarly situated with respect to capital

gains realized on a sale of a capital asset in the United States should not have to pay a tax under our domestic tax laws. The court said that the purpose of the treaty was to "secure reciprocity and equality of tax treatments between the nationals of the two contracting parties." The court went on to say there was no occasion for an express concession by the United Kingdom in the treaty with respect to trusts, because it does not impose an income tax on capital gains in any event. In this regard, the court held:

We think "exempt" was employed in its broadest meaning, signifying a release from economic burden. If the capital gains tax is imposed on the trust in the instant case, the United Kingdom beneficiaries and remaindermen are burdened economically with the United States tax, as it diminishes both their respective incomes and corpus distributions.

We are not persuaded that the contracting parties intended such an economic burden be placed on United Kingdom taxpayers, when in a similar situation a United States income beneficiary or remainderman would not have a similar burden arising from United Kingdom taxation.

A study of the Articles of the Convention indicates an attempt to achieve a thoroughgoing reciprocity between the two nations' taxpayers in similar situations. Upon its face Article XIV does not portray any concession by the United Kingdom. The policy of reciprocity is apparent, however, when it is realized that the United Kingdom does not impose an income tax upon capital gains; it is obvious there was no occasion for any express concession on this point by it. 247 F.2d at 153.

Applying the principles of that case to the one before us, it is clear that our decision should be made on the basis of reciprocity and equal tax treatment of the citizens of both countries. In our case, the Treaty is silent on the question of interest on tax refunds, but like in *Smyth* that is of no consequence, because under the laws of the United Kingdom interest is not paid on tax refunds. Therefore, like in *Smyth*, there was no need for a provision on this point to be included in the Treaty. It is clear that under the Treaty involved here, if a United States citizen gets a tax refund from the United Kingdom he could not collect interest on the refund. On the basis of reciprocity (and *Smyth*) a citizen of the United Kingdom, such as the plaintiff in the instant case, who gets a tax refund from the United States should not be able to collect interest on the refunded taxes. To hold otherwise places an economic burden on citizens of the United States as compared to citizens of the United Kingdom similarly situated. Obviously, the framers of the Treaty and the governments which ratified it did not intend to discriminate between the citizens of the two countries, nor to create a windfall for citizens of the United Kingdom, such as the plaintiff and others who may have similar claims, when such benefits are denied to citizens of the United States who are in a similar situation. Therefore, the plaintiff's claim should be denied on the basis of reciprocity.

I would deny plaintiff's motion for summary judgment and grant that of defendant and dismiss plaintiff's petition.